# AGNES FRASER, EXECUTRIX (ESTATE OF HECTOR FRASER) *v.* UNITED STATES OF AMERICA
## (15035)

Peters, C. J., and Callahan, Borden, Berdon and Katz, Js.

Argued December 5, 1995—officially released April 16, 1996

*Michael P. Koskoff,* with whom was *Mark C. Durkin,* for the appellant (plaintiff).

*Carl J. Schuman,* assistant United States attorney, with whom were *John B. Hughes,* assistant United States attorney, and, on the brief, *Christopher F. Droney,* United States attorney, and *Nancy L. Griffin,* assistant United States attorney, for the appellee (defendant).

*Richard Blumenthal,* attorney general, and *Susan Quinn Cobb,* assistant attorney general, filed a brief for the department of mental health and addiction services as amicus curiae.

*William I. Garfinkel, Brian R. Shagan* and *James Smart,* law student intern, filed a brief for the Mental Health Association of Connecticut, Inc., as amicus curiae.

*Lansing E. Crane* filed a brief for the Connecticut Psychiatric Society as amicus curiae.

*Thomas A. Behrendt, William Emmett Dwyer* and *William B. Wynne* filed a brief for the Center for Independent Living of Southwestern Connecticut et al. as amici curiae.

PETERS, C. J. In this case, certified from the United States Court of Appeals for the Second Circuit, we have agreed to decide whether, in the circumstances presented herein, psychotherapists undertaking the treatment of a psychiatric outpatient assumed a duty to exercise control over the patient to prevent the patient from committing an act of violence against a third person. The plaintiff, Agnes Fraser, executrix of the estate of Hector Fraser, brought an action in the United States District Court for the District of Connecticut against the defendant, the United States of America, acting through its employees at the West Haven Veterans Administration Medical Center (medical center). The

plaintiff alleged that she was entitled to damages, under the Federal Tort Claims Act; 28 U.S.C. § 2671 et seq.; because the medical center's negligent treatment of John Doe,[1] an outpatient there, resulted in the fatal stabbing of her decedent. The plaintiff claimed that the medical center was negligent in its treatment of Doe because it had failed to warn others of his violent propensities and had failed to take reasonably necessary actions to control him in order to protect others. The District Court granted the defendant's motion for summary judgment because, in its view of the undisputed facts, the medical center owed no duty to the plaintiff's decedent. The plaintiff appealed to the United States Court of Appeals for the Second Circuit, which agreed with the District Court that the medical center had no duty to warn the plaintiff's decedent, but asked this court to decide whether the medical center had a duty to control Doe's conduct to avoid harm to the plaintiff's decedent. Pursuant to the applicable certification procedures; General Statutes § 51-199a;[2] we agreed to decide this issue.[3] We conclude that the medical center had no duty to control its outpatient, Doe, to avoid personal injury to unidentifiable third persons such as the plaintiff's decedent and, therefore, answer the certified question in the negative.

[1] The District Court granted Doe's request to have his real name deleted from the court's record.

[2] General Statutes § 51-199a provides in relevant part: "Short title: Uniform Certification of Questions of Law Act. (a) This section may be cited as the 'Uniform Certification of Questions of Law Act'.

"(b) The supreme court may answer questions of law certified to it by . . . a court of appeals of the United States . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state."

[3] We certified the following question: "In the circumstances of this case, does a psychotherapist have a duty to control a patient being treated on an outpatient basis in order to prevent harm to third persons?"

The record before the District Court establishes the following undisputed facts. Doe had a longstanding, friendly relationship with the plaintiff's decedent, Hector Fraser (Fraser). When Doe was a teenager, he worked at a floor covering store that Fraser then owned. After Doe's release from military service, he again worked for Fraser as a carpet installer. Both before and after his military service, Doe was a frequent visitor to the Fraser home. Although Doe spoke repeatedly of spies and carried a buck knife, he never threatened Fraser or any other member of the Fraser family. Nonetheless, on June 17, 1985, without apparent provocation, Doe stabbed Fraser approximately forty times and Fraser died the next day as a result of the stabbing.

At the time of the assault on Fraser, Doe was being treated as a psychiatric outpatient at the medical center. Doe's history of psychiatric care began while he was serving in the United States Marine Corps. He was discharged from the military in 1974 after being diagnosed as having schizo-affective schizophrenia manifested by paranoid delusions. Because of his psychosis and the accompanying delusions of violence, Doe thereafter was continuously under psychiatric care, sometimes for brief periods as an inpatient, but otherwise as an outpatient. Doe was an outpatient at the medical center from September, 1979, until the fatal assault on Fraser in 1985. Throughout his psychiatric therapy, Doe suffered from a variety of delusions, believing himself to be engaged in secret spy missions and in violent confrontations involving fights and killings. Doe's medical center records documented that he harbored these delusions, but documented no acts of violence or even threats on his part. They also documented his regular attendance at scheduled therapy sessions.

The medical center's records included information that Doe, in the past, had carried a knife and loaded guns. In 1976, he was arrested for carrying two loaded

guns and a knife.[4] His psychotherapists had advised him to get rid of these weapons. Furthermore, Fraser's son had observed Doe carrying knives "as far back as 1981," but he had never known Doe to threaten Fraser or any other member of the Fraser family.

On June 6, 1985, Doe informed medical center staff members that he had stopped taking Haldol, his prescribed neuroleptic medication. His doctors persuaded him to take another neuroleptic, Trilafon, and told him to return in one week or sooner. On June 13, 1985, Doe appeared at the medical center as scheduled. At that appointment, he reported that he was feeling and sleeping better as a result of taking the new medication. Staff members were unaware of any deterioration in Doe's mental condition. Four days later, he committed the fatal assault on Fraser.

On this record, the Court of Appeals upheld the determination of the District Court that the plaintiff could not prevail on her claim that the medical center had a legal duty to warn Fraser that Doe would commit an act of violence against him. The Court of Appeals held that, "in the absence of any objective indicia of a patient's propensity to cause harm," summary judgment had properly been granted on this cause of action. The Court of Appeals reserved for us, however, the merits of the plaintiff's alternate cause of action premised on a breach of a duty to control, and this is the basis for the certified question that we agreed to answer.

The question that we certified is whether, in the circumstances of this case, a psychotherapist has a duty to control an outpatient to prevent the outpatient from causing harm to a third person. In its broader form, the certified question addresses the legal consequences of outpatient psychotherapy, specifically whether the relationship between a psychotherapist and an outpatient

---

[4] In 1979, he also was arrested once for stealing.

is properly characterized as the kind of special custodial relationship that imposes on the psychotherapist the duty to control the behavior of the outpatient to prevent the outpatient from causing bodily harm to third persons. See *Tarasoff* v. *Regents of University of California*, 17 Cal. 3d 425, 431, 551 P.2d 334, 131 Cal. Rptr. 14 (1976) (imposing duty on psychiatrists to protect foreseeable victims of outpatient); see also 2 Restatement (Second), Torts § 319 (1965).[5] In its narrower form, the certified question addresses the legal consequences of the psychotherapists' failure to control the behavior of an outpatient in the circumstances of this case.

Common law prudence counsels that we should refrain from deciding the broader question. As the Court of Appeals observed in certifying the question of law to us in this case, litigation of this kind does not arise frequently. We have no compelling precedents on which to draw, and courts in other jurisdictions have not arrived at a consensus. Finally, even if we were to resolve the broader question in favor of recognizing a special relationship, we would still have to decide the narrower question of the scope of the duty arising from such a relationship. We, therefore, will confine our discussion to the question of whether a psychotherapist has a duty to exercise control to prevent an outpatient, who was not known to have been dangerous, from inflicting bodily harm on a victim who was neither readily identifiable nor within a foreseeable class of victims.[6]

---

[5] Section 319 of 2 Restatement (Second), Torts (1965) provides: "Duty of Those in Charge of Person Having Dangerous Propensities

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

[6] The District Court determined that the psychotherapists at the medical center could not have foreseen that Doe would harm anyone. The District Court further determined that they could not have foreseen that, if Doe

Our decision is premised on these factual circumstances because they are the circumstances that have been found to exist in the relevant decision of the federal court in this case. In deciding that the plaintiff had failed to establish a factual predicate for a duty to warn, the Court of Appeals expressly concluded that the record demonstrated "the absence of any objective indicia of [Doe's] propensity to cause harm." The Court of Appeals rejected the plaintiff's argument that a jury question was raised by expert testimony that suggested that Doe's psychotherapists should have engaged in a more searching inquiry to discover that Doe had become dangerous either to himself or to others.[7] In effect, the Court of Appeals upheld the conclusion of the District Court that "even viewing the facts most favorably to the plaintiff on the defendant's motion for summary judgment, the evidence did not show that it was foreseeable that Doe would commit an act of violence against [Fraser]." For the purpose of deciding the certified question of law, namely, whether, in the

were to harm anyone, he would attack Fraser or a person within a class of identifiable victims, such as authority figures, that contained Fraser.

[7] The record before the Court of Appeals established that there were no objective indicia, such as threats or acts of violence, in Doe's long history of psychotherapy that Doe had ever been dangerous to anyone, or had exhibited a tendency to become dangerous to anyone. Although these underlying facts are undisputed, the plaintiff submitted the depositions and affidavits of two psychiatric experts and contended that these opinions were sufficient to raise a material question of fact as to whether the medical center should have inquired further to determine if Doe were dangerous. These experts opined that during "the weeks preceding the homicide, Doe's psychiatric condition was in a state of decompensation . . . he was psychotic, and, had the [medical center staff] asked the necessary questions as to how Doe was feeling . . . they would have discovered his state of decompensation." In addition, one of the experts stated that it was predictable that Doe would become violent on June 17, 1985, because the medical center had recently changed his medication. The other expert opined that Fraser was an identifiable victim. The Court of Appeals concluded that these affidavits and depositions did not raise a material question of fact. Our decision is premised on the circumstances that the federal court concluded were determinative in this case.

circumstances of this case, the psychotherapists had a duty to control Doe, we take the underlying facts and circumstances to be the same as those that the federal court concluded were determinative with respect to the psychotherapists' duty to warn.

Turning now to the merits of the certified question, we are persuaded that, as a matter of law in the circumstances of this case, the medical center psychotherapists had no duty to exercise control over Doe to prevent him from assaulting Fraser. We reach this conclusion for four reasons: (1) our decisions defining negligence do not impose a duty to those who are not identifiable victims; (2) in related areas of our common law, we have concluded that there is no duty except to identifiable persons; (3) policy reasons inherent in the psychotherapeutic relationship and in the due process rights of mental patients counsel against imposing expansive duties to exercise control over such patients; and (4) courts in other jurisdictions have overwhelmingly declined to extend any duty to control to encompass harm to unidentifiable third persons.

Existing Connecticut precedents impose only a limited duty to take action to prevent injury to a third person. Our point of departure has been that "absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another. See 2 Restatement (Second), Torts § 315 (1965); F. Harper, F. James & O. Gray, The Law of Torts (2d Ed. 1986) § 18.7; W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 56." *Kaminski* v. *Fairfield*, 216 Conn. 29, 33–34, 578 A.2d 1048 (1990); see also *Dennison* v. *Klotz*, 12 Conn. App. 570, 578–79, 532 A.2d 1311 (1987), cert. denied, 206 Conn. 803, 535 A.2d 1317 (1988). In any determination of whether even a special relationship should be held to give rise to a duty to exercise care to avoid harm to a third person, foreseeability plays an important role. "Duty is a legal conclusion about

relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although . . . no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . Thus, initially, if it is not foreseeable to a reasonable person in the defendant's position that harm of the type alleged would result from the defendant's actions to a particular plaintiff, the question of the existence of a duty to use due care is foreclosed, and no cause of action can be maintained by the plaintiff." (Citations omitted; internal quotation marks omitted.) *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 385–86, 650 A.2d 153 (1994).

In only one instance has this court considered what relationships might trigger a special duty of care to protect third parties from personal harm. In *Kaminski* v. *Fairfield*, supra, 216 Conn. 34–37, we looked to § 319 of the Restatement (Second), Torts, supra, and to *Tarasoff* v. *Regents of University of California*, supra, 17 Cal. 3d 431, and its progeny, for guidance as to what might constitute such a special relationship. For present purposes, it is significant that we described the duty first articulated in *Tarasoff* and further refined in *Thompson* v. *County of Alameda*, 27 Cal. 3d 741, 752–53, 614 P.2d 728, 167 Cal. Rptr. 70 (1980), as a duty arising out of "a psychotherapist's knowledge of a patient's specific threats against a specific victim, whom the patient subsequently killed." *Kaminski* v. *Fairfield*, supra, 37. Our conclusion in *Kaminski* that the injured third party had not established a duty to protect him from physical harm rested in part on the fact that he, unlike the victim in *Tarasoff*, "was not a specifically identifiable victim." Id. We therefore have no precedent

for imposing a duty on psychotherapists to exercise control over an outpatient in the absence of a showing that the victim was either individually identifiable or, possibly, was either a member of a class of identifiable victims or within the zone of risk to an identifiable victim.

Related areas of Connecticut negligence law provide support for the proposition that proof that the victim was an identifiable target is ordinarily an essential element of an action in negligence. As a common law matter, to impose liability on a municipal employee who presumptively enjoys immunity in the performance of discretionary governmental acts, a plaintiff must show the existence of circumstances that "make it apparent to the public officer that his or her failure to act would be likely to subject an *identifiable person* to imminent harm . . . ." (Emphasis added; internal quotation marks omitted.) *Mulligan* v. *Rioux*, 229 Conn. 716, 728, 643 A.2d 1226 (1994), on remand, 38 Conn. App. 546, 662 A.2d 153 (1995); *Burns* v. *Board of Education*, 228 Conn. 640, 645, 638 A.2d 1 (1994); *Sestito* v. *Groton*, 178 Conn. 520, 528, 423 A.2d 165 (1979). As a statutory matter, although numerous changes in tort law have affected the remedies that may be recovered for breach of duty, none has enlarged the scope of liability in negligence to injured third parties. See, e.g., General Statutes § 52-572h.

Considerations of public policy, which undergird the judicial determination of the scope of duty in the law of negligence, likewise suggest that psychotherapists should not be held liable to third parties who are not foreseeable victims. In addressing the third party liability of attorneys for the negligent execution of estate planning documents, we have balanced the interests of intended beneficiaries against the interests of the legal profession in honoring the ethical obligations owed by attorneys to their clients. See *Krawczyk* v. *Stingle*, 208

Conn. 239, 244–46, 543 A.2d 733 (1988) (no liability to intended beneficiary for negligent delay in drafting estate planning documents). We deem it equally appropriate to balance the interests of those injured by psychiatric outpatients against the interests of the mental health profession in honoring the confidentiality of the patient-therapist relationship; see General Statutes §§ 52-146d through 52-146j; and in respecting the humanitarian and due process concerns that limit the involuntary hospitalization of the mentally ill. See *State v. Warren*, 169 Conn. 207, 215–16, 363 A.2d 91 (1975); see also General Statutes §§ 17a-498 and 17a-502; *Payne v. Fairfield Hills Hospital*, 215 Conn. 675, 684, 578 A.2d 1025 (1990). Whatever that balancing process may indicate in other circumstances, it counsels against the imposition of liability for harm to unidentifiable victims or unidentifiable classes of victims of outpatients with no history of dangerous conduct or articulated threats of dangerous behavior. See note, "Duty to Warn Versus Duty to Maintain Confidentiality: Conflicting Demands on Mental Health Professionals," 20 Suffolk U. L. Rev. 579, 612–13 (1986); V. Mangalmurti, "Psychotherapists' fear of *Tarasoff*: all in the mind?," 22 J. Psychiatry & L. 379 (1994); C. Meyers, "Where the protective privilege ends: California changes the rules for dangerous psychotherapy patients," 19 J. Psychiatry & L. 5, 26–27 (1991); R. Schopp, "The Psychotherapist's Duty to Protect the Public: The Appropriate Standard and the Foundation in Legal Theory and Empirical Premises," 70 Neb. L. Rev. 327, 350–60 (1991).

Finally, state courts in other jurisdictions have overwhelmingly concluded that an unidentifiable victim has no claim in negligence against psychotherapists who were treating the assailant on an outpatient basis. Some state courts have entirely rejected this duty, as identified in *Tarasoff*, and have held that psychotherapists treating outpatients have no liability whatsoever to third

persons injured by their outpatients. See, e.g., *Santa Cruz* v. *Northwest Dade Community Health Center, Inc.*, 590 So. 2d 444, 445 (Fla. App. 1991), review denied, 599 So. 2d 1278 (Fla. 1992); *Boulanger* v. *Pol*, 258 Kan. 289, 900 P.2d 823, 834–35 (1995); *Nasser* v. *Parker*, 249 Va. 172, 179–80, 455 S.E.2d 502 (1995). Even courts that have not rejected *Tarasoff* outright, however, have generally not required psychotherapists to take remedial measures for the protection of victims who were not either specifically identifiable or within a class of foreseeable victims. See, e.g., *Hamman* v. *County of Maricopa*, 161 Ariz. 58, 64, 775 P.2d 1122 (1989) (victim within identifiable zone of danger); *Thompson* v. *County of Alameda*, supra, 27 Cal. 3d 752–53 (specifically foreseeable and readily identifiable victim); *Naidu* v. *Laird*, 539 A.2d 1064, 1073 (Del. 1988) (victim within foreseeable class); *Kirk* v. *Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 531, 513 N.E.2d 387 (1987), cert. denied, 485 U.S. 905, 108 S. Ct. 1077, 99 L. Ed. 2d 236 (1988) (specifically identifiable victim); *Evans* v. *Morehead Clinic*, 749 S.W.2d 696, 699 (Ky. App. 1988) (readily identifiable victim); *Furr* v. *Spring Grove State Hospital*, 53 Md. App. 474, 489, 454 A.2d 414 (1983) (readily identifiable victim); *Hinkelman* v. *Borgess Medical Center*, 157 Mich. App. 314, 321, 403 N.W.2d 547, appeal denied, 428 Mich. 905 (1987) (readily identifiable victim); *Kerrville State Hospital* v. *Clark*, 900 S.W.2d 425, 437 n.13 (Tex. App.) (victim within foreseeable zone of danger), writ granted, 39 Tex. Sup. Ct. J. 107 (1995); *Peck* v. *Counseling Service of Addison County, Inc.*, 146 Vt. 61, 67–68, 499 A.2d 422 (1985) (identifiable victim);[8] but see, e.g., *McIntosh* v. *Milano*,

---

[8] Applying state law in accordance with the principles set forth in *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), and its progeny, federal court cases have come to similar conclusions. Some cases hold that a psychotherapist does not have a duty to exercise any control over an outpatient. See, e.g., *Currie* v. *United States*, 836 F.2d 209, 212–13 (4th Cir. 1987) (North Carolina). Other cases hold that such a duty may exist, but that it is limited in scope. See, e.g., *Brady* v. *Hopper*, 570 F.

168 N.J. Super. 466, 489–90, 403 A.2d 500 (1979) (any intended or potential victim); *Schuster* v. *Altenberg*, 144 Wis. 2d 223, 234–38, 424 N.W.2d 159 (1988) (anyone injured by patient's dangerous tendencies).[9]

These considerations persuade us that, in the circumstances of this case, the medical center owed no duty to control Doe so as to prevent Doe's assault on Fraser. The medical center neither knew nor had reason to know that Doe would attack Fraser because Fraser was not an identifiable victim, a member of a class of identifiable victims or within the zone of risk to an identifiable victim.

The answer to the certified question is: No.

No costs shall be taxed in this court to either party.

In this opinion CALLAHAN, BORDEN and KATZ, Js., concurred.

BERDON, J., dissenting. In this very unusual case,[1] we are asked by the United States Court of Appeals for the Second Circuit to determine whether, under Connecticut law, there is a "general duty on the part of a psychotherapist to control a patient being treated

Sup. 1333, 1338–39 (D. Colo. 1983), aff'd, 751 F.2d 329 (10th Cir. 1984) (specific threats to specific victims); *Hasenei* v. *United States*, 541 F. Sup. 999, 1012–13 and n.24 (D. Md. 1982) (specific danger to readily identifiable person or group of persons); *Lipari* v. *Sears, Roebuck & Co.*, 497 F. Sup. 185, 193–95 (D. Neb. 1980) (foreseeable victims, which may include members of class).

[9] *McIntosh* v. *Milano*, supra, 168 N.J. Super. 466, is distinguishable on its facts from the case before us. In *McIntosh*, the psychiatric outpatient had informed his treating psychiatrist that he had had a sexual relationship with the young woman who became his victim, that he had fired a gun at a car belonging to her or her boyfriend, that he "had purchased and carried a knife to show to people to scare them away," and that he had strong negative feelings about the victim after their relationship had ended. Id., 472–73.

[1] This case is unusual because of its procedural posture and because of the facts relied upon by both the majority of this court and the Second Circuit Court of Appeals.

on an outpatient basis in order to prevent harm to third persons?"

In its initial order (order) requesting that we accept the certified issues,[2] the Court of Appeals explained that the rendering of a summary judgment by the United States District Court for the District of Connecticut raised two issues under Connecticut law: (1) whether a psychotherapist has a duty to warn; and (2) whether a psychotherapist has a duty to control. With respect to the duty to warn, the Court of Appeals wrote in its order: "The plaintiff asserts that her claim premised on the duty to warn should reach the jury because she presented expert opinion testimony to the effect that the psychiatric staff at [the West Haven Veterans Administration Medical Center (medical center)] would have discovered a threat of harm to [the victim, Hector Fraser,] if the staff had asked [the patient, John Doe,] the right questions. However, in the absence of any objective indicia of a patient's propensity to cause harm, we are unwilling to conclude that, under Connecticut tort law, a claim alleging a breach of a duty to warn should reach a jury solely on the basis of expert opinion testimony suggesting that more searching questioning by the . . . psychotherapist would have revealed the patient's otherwise unforeseeable potential for harm." Upon receiving the order, we requested that the Court of Appeals furnish us with a factual predicate upon which the certified issue may be decided. In response,

---

[2] The Court of Appeals requested that we certify the following issues: (1) "Does Connecticut recognize a general duty on the part of a psychotherapist to control a patient being treated on an outpatient basis in order to prevent harm to third persons?" and (2) "If so, do the allegations of the complaint in the pending case, as amplified by the submissions of the plaintiff in opposition to the defendant's motion for summary judgment, present a triable jury issue?" This court amalgamated these issues into the single question we certified: "In the circumstances of this case, does a psychotherapist have a duty to control a patient being treated on an outpatient basis in order to prevent harm to third persons?"

and because this case comes to the appellate courts by way of summary judgment, the parties entered into a "joint statement of relevant factual circumstances" (stipulation). Because the stipulation was furnished in response to our request, and was specifically approved by the Court of Appeals, that court clearly indicated that we were to decide this case on the facts as set forth in the stipulation.

What is troubling, however, is that the approved stipulation entered into by both parties does not support the factual conclusion on which the Court of Appeals rejected the plaintiff's duty to warn cause of action—that is, the claim was rejected because of the court's conclusion that there was no objective indicia of Doe's propensity to cause harm. The majority of this court, in its curious rush to embrace this conclusion, looks solely to the order of the Court of Appeals, and ignores the facts set forth in the stipulation. In doing so, this court frames the issue as a rhetorical question: "[W]hether a psychotherapist has a duty to exercise control to prevent an outpatient, who was not known to have been dangerous, from inflicting bodily harm on a victim who was neither readily identifiable nor within a foreseeable class of victims?" The approved stipulation of the parties, however, contradicts the factual premises that the majority relies upon in reaching its conclusion. The questions of whether Doe had a propensity for violence and whether Fraser was a foreseeable victim are genuine issues of fact to be resolved by the trier. " 'Summary judgment procedure is designed to dispose of actions in which there is no genuine issue as to any material fact.' " *Dougherty* v. *Graham*, 161 Conn. 248, 250, 287 A.2d 382 (1971); see also Fed. R. Civ. P. 12 (c) and 56. Consequently, the granting of the defendant's motion for summary judgment was improper in this instance.

From 1974 to the time he fatally stabbed Fraser, Doe was continuously treated by the medical center on both an inpatient and an outpatient basis. The objective indicia of Doe's propensity to cause harm prior to his fatal stabbing of Fraser on June 17, 1985, which the Court of Appeals and this court find missing, is clearly set forth in the stipulation. The stipulation provides: "Doe's psychiatric illness was first diagnosed in May, 1974, while he was in the Marines, as 'schizo-affective schizophrenia' by the Evans Mental Hygiene Clinic in Okinawa. . . . A portion of Doe's medical records for [the period from May, 1974, through September, 1979,] describe[s] him to be suffering 'from a mental illness of psychotic proportions' . . . and having 'a very complex system of delusions involving his role as a special agent and a spy.' . . . Doe's diagnoses included, inter alia, schizophrenia, paranoid schizophrenia, and chronic paranoid schizophrenia. . . . Doe's medical records since May, 1974, detail many incidents where Doe describes himself as being involved in 'secret missions . . . for the [Central Intelligence Agency] and [the Federal Bureau of Investigation] involving secret rendezvous, stakeouts and top secret investigations' . . . and in *violent confrontations, fights and killings involving knives and guns*. Doe believed himself to be involved with the Mafia or to be [Frank] Serpico. . . . Doe's therapists believed that these events were part of Doe's delusional thinking. . . . [O]ne of Doe's medical records from [the medical center] in September, 1974, states: 'So far as is known, no behavioral acts of violence have occurred, however, the patient was noted in the service to go to the backs of theaters or other places and when inquiring about what he was doing at these places he reported that he was waiting for contacts so that *at least to some extent this delusional system at times spilled over into behavior.*' . . . Doe is described as dressing in unusual manners (i.e., 'superfly

clothes,' army fatigues, long coats). . . . Doe's sister
. . . reported incidents where she found Doe laughing
out loud for no apparent reason while eating raw meat
and *holding a gun.* . . . In September, 1976, Doe was
arrested for *carrying two loaded guns and a knife.*
. . . A hospital summary dated September 9, 1979, states
that Doe had begun keeping *loaded guns close to his
bed and had carried them in public places* since the
early 1970s." (Emphasis added.) These stipulated facts
clearly reflect objective indicia of Doe's propensity to
act on his delusions of violence and to harm others.

Furthermore, evidence that Doe's victim should have
been foreseeable to the psychotherapists at the medical
center was also clearly articulated in the stipulation.
"The [medical center's] doctors knew that Doe pos-
sessed weapons and carried a knife and loaded guns
because Doe's medical records make reference to such
conduct. Doe's doctors cautioned him about the dan-
gers associated with guns and/or advised him to get rid
of them. . . . Doctors [James] Alexander and [Robert]
Granacher [psychiatric experts retained by the plaintiff]
have opined that in the months (April and May) and
the weeks preceding the homicide, Doe's psychiatric
condition was in a state of decompensation (Granacher
testified 'massive decompensation'), he was psychotic,
and, had the [medical center's psychiatric staff] asked
the necessary questions as to how Doe was feeling—if
he was psychotic or having delusions and what he was
thinking—they would have discovered his state of
decompensation. Doctor [Francis] Hamilton [a third
psychiatrist who observed Doe, though not retained by
the plaintiff as an expert] testified that on June 17,
1985, Doe was clearly psychotic. . . . Doctor Hamilton
identified certain changes in Doe's life and emotional
state in the weeks preceding the homicide, (Doe's medi-
cation was changed to Trilafon after he reported he
had stopped taking Haldol, he had trouble sleeping, *he*

*became more convinced that Hector Fraser was part of a British plot).* . . . Doctors Granacher and Alexander identified these factors as signs of decompensation. . . . Doctors Alexander and Granacher were of the opinion that Doe was potentially violent, a danger to others around him and that the [medical center] should have known of the dangers he posed. . . . Doctor Alexander opined that Hector Fraser, a Scottish immigrant, was an identifiable victim of what he opined was Doe's violent propensity. . . . Doctor Granacher opined that it was predictable that Doe would become violent [on or] about June 17, 1985, because of the amount of time it takes for the medication Doe had stopped taking approximately two and one-half weeks before the homicide to leave his body." (Emphasis added.)

I find it difficult to understand the analysis of the Court of Appeals, and even more so, I find it difficult to understand this court's conclusion. Certainly, neither this court nor the Court of Appeals wants to imply that before a patient is deemed to have a *propensity* for violence, he or she must have actually caused harm to another. Objective indicia of an individual's *propensity* to do violence to another may be revealed in forms other than specific acts or threats of violence. In this case, the medical center's well documented record indicates that Doe's habit of carrying a hunting knife (the weapon that was used by Doe to stab Fraser forty times) and loaded guns was known. Also known was the fact that Doe suffered from and acted on his delusions of being engaged in secret spy missions and in violent confrontations involving fights and killings. Surely, a reasonable psychotherapist should have recognized Doe as an individual with a propensity for violence. Additionally, Doe's belief that Fraser was involved in a British espionage plot, under the circumstances of this case, identified Fraser as a foreseeable victim. This court should not compound the mistake of the Court

of Appeals by blindly accepting that court's conclusion with respect to Doe's propensity to cause harm when such a conclusion is at odds with the stipulation of facts upon which we were specifically requested to decide the certified issue. Accordingly, there is sufficient evidence for a jury to conclude that Doe had a propensity for violence and that Fraser was a foreseeable victim.

In light of the facts of this case, I would reframe the issue as follows: Whether a psychotherapist has a duty to exercise control to prevent an outpatient, who has a propensity to cause harm, from inflicting bodily harm on a victim who was identifiable or was within a class of foreseeable victims? Although the majority does not definitively answer this question, I would assume that, as framed above, their answer would be yes. In other words, a psychotherapist has a duty to third persons to control the conduct of his or her patient when the psychotherapist knows or should know that the patient's dangerous propensities present a foreseeable risk of harm to others.[3] As set forth in § 315 of the

---

[3] I am sensitive to the public policy arguments raised by the amici with respect to the imposition of civil liability on a psychotherapist for failing to control his or her patient who has a propensity to cause harm and who is not in a custodial setting. Those arguments are: it is difficult for psychotherapists to predict violent behavior; recognizing a duty to control will result in an over prediction of violence and an over commitment of individuals; patients will be reluctant to seek treatment or to make full disclosure of their thoughts; and liability concerns will have a distorting influence on admission decisions. "Against [these interests and arguments], however, we must weigh the public interest in safety from violent assault." *Tarasoff* v. *Regents of University of California*, 17 Cal. 3d 425, 440, 551 P.2d 334, 131 Cal. Rptr. 14 (1976) ("When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger." Id., 431.).

Moreover, similar concerns were raised in opposition to the decision enunciated in *Tarasoff*. Since *Tarasoff* was decided in 1976, empirical data indicates that no adverse effects have resulted because of the decision. In a study reported in the Wisconsin Law Review, it was concluded that: (1)

Restatement (Second) of Torts, an individual has this duty if "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or a special relation exists between the actor and the other which gives to the other a right to protection." Unlike the situation in *Kaminski* v. *Fairfield*, 216 Conn. 29, 36, 578 A.2d 1048 (1990), where the court held that under § 319 of the Restatement (Second), supra, a relationship between a parent and an adult child did not constitute a special relationship as contemplated in § 315, the relationship in this case between the medical center's treating psychotherapists and Doe does constitute such a relationship.[4] Consequently, this case presents an occasion for this court to adopt the principle embodied in § 315.

Many jurisdictions have recognized a duty on the part of psychotherapists to control the potentially dangerous conduct of their patients. In a case in which the fact pattern is similar to the one presently before this court, a patient had been treated as an outpatient for eighteen months. *Lundgren* v. *Fultz*, 354 N.W.2d 25, 27 (Minn.

95 percent of the psychiatric medical community believed that it is possible to predict violent behavior; (2) psychotherapists have not been discouraged from treating dangerous patients; and (3) there has not been an increased use of involuntary commitment of patients perceived as dangerous. D. Givelber, W. Bowers & C. Blitch, "*Tarasoff*, Myth and Reality: An Empirical Study of Private Law in Action," 2 Wis. L. Rev. 443, 463, 479–80, 481–83 (1984). Furthermore, I agree that psychiatry is far from an exact science. Nevertheless, the strengths and weaknesses of the field of psychiatry to predict future behavior are factors that a jury may take into account when determining whether a psychotherapist has acted negligently and has breached his or her duty.

[4] In Connecticut, psychotherapists may exercise control through the emergency commitment procedure set forth in General Statutes § 17a-502 (a), which allows a physician to civilly commit an individual whom he or she believes is "mentally ill and dangerous to himself or others . . . and is in need of immediate care and treatment in a hospital for mental illness" for up to fifteen days without a court order. Therefore, in this case, there was a legal mechanism available for the medical center to commit Doe and prevent him from murdering Fraser.

1984). After missing a number of scheduled appointments and refusing to take his prescribed medication, the patient entered a restaurant and shot and killed the victim in "an unprovoked and random attack." Id. The *Lundgren* court held that "[c]lose questions on foreseeability should be given to the jury. . . . A jury could also conclude that [the patient] presented a danger to the public when armed with the handguns that figured so largely in his psychosis and that someone in [the treating physician's] position should have foreseen that harm to a member of the public might result." Id., 28–29. Several other jurisdictions have imposed a duty upon psychotherapists treating patients on an outpatient basis. See, e.g., *Lipari* v. *Sears, Roebuck & Co.*, 497 F. Sup. 185, 193 (D. Neb. 1980) ("the relationship between a psychotherapist and his patient gives rise to an affirmative duty for the benefit of third persons . . . [requiring] that the therapist initiate whatever precautions are reasonably necessary to protect potential victims of his patient"); *McIntosh* v. *Milano*, 168 N.J. Super. 466, 489, 403 A.2d 500 (1979) (despite fact that patient did not communicate specific threats of violence toward identifiable victim, "a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine . . . that the patient is or may present a probability of danger to that person"); *Kerrville State Hospital* v. *Clark*, 900 S.W.2d 425, 436–37 n.13 (Tex. App. 1995) (patient need not verbalize specific threat; duty to general public so long as danger is foreseeable); *Peck* v. *Counseling Service of Addison County, Inc.*, 146 Vt. 61, 68, 499 A.2d 422 (1985) ("mental health professional who knows or, based upon the standards of the medical health profession, should know that his or her patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect him or her from that danger").

Therefore, I would report to the Court of Appeals that, under Connecticut law, a psychotherapist has a duty to control a patient's conduct if the psychotherapist knows or should know that the patient's dangerous propensities present a foreseeable risk of injury to a victim who is identifiable or within a class of foreseeable victims. Additionally, based on the stipulation, the issues of whether the medical center's psychiatric staff knew or should have known that Doe had dangerous propensities and whether Fraser was a foreseeable victim are questions of fact for a jury.

Accordingly, I dissent.

