**Jack GARAMELLA, Conservator FOR the ESTATE OF Denny ALMONTE**

v.

**NEW YORK MEDICAL COLLEGE, et al.**

**No. Civ. 3:93CV116 (HBF).**

United States District Court,
D. Connecticut.

Sept. 1, 1998.

Karen E. Koskoff, Susan Fink, Koskoff, Koskoff & Bieder, Bridgeport, CT, for Plaintiff.

Madonna A. Sacco, Gaileen A. Kaufman, Bai, Pollock & Coyne, Bridgeport, CT, for Defendant.

## RULING ON DR. INGRAM'S MOTION FOR SUMMARY JUDGMENT

FITZSIMMONS, United States Magistrate Judge.

This is an action for personal injury, filed by a patient sexually abused by a psychiatric resident at Danbury Hospital. The defendants in this case are New York Medical College ("NYMC"), the institution which supervised the residency, and Dr. Douglas Ingram, with whom the abuser underwent personal analysis as a requirement of his training in psychoanalysis. Plaintiff claims that the medical school and Dr. Ingram had a duty to warn or otherwise prevent the resident, R. Joseph DeMasi, from harming children in his care. DeMasi was prosecuted criminally for assaulting the plaintiff, convicted by guilty plea, and incarcerated. The plaintiff, Denny Almonte, now 19 years old, is also incarcerated.

Dr. Ingram moves for judgment as a matter of law on the basis that he owed plaintiff

no duty to control Dr. DeMasi and no duty to warn plaintiff of DeMasi's pedophiliac fantasies. [Doc. # 199]. Judge Nevas denied defendant's Motion to Dismiss on this issue in 1994, relying on the District Court opinion, *Fraser v. United States*, Civ. No. 5:87CV0125 (WWE), 1993 WL 667632 (D.Conn. July 15, 1993), and other cases. *See Almonte v. New York Medical College*, 851 F.Supp. 34 (D.Conn.1994).

Defendant now seeks reconsideration of Judge Nevas' ruling in light of the Connecticut Supreme Court's subsequent opinion in *Fraser v. United States*, 236 Conn. 625, 674 A.2d 811 (1996), and *Fraser v. United States*, 30 F.3d 18 (1994), *cert. denied*, —— U.S. ——, 117 S.Ct. 188, 136 L.Ed.2d 126 (1996).[1]

For the reasons that follow, Dr. Ingram's Motion for Summary Judgment is **DENIED** [Doc. # 199].[2]

## UNDISPUTED FACTS

### Dr. Douglas Ingram

Dr. Ingram is a board certified psychiatrist with a sub-specialty in psychoanalysis. [Ingram Aff. ¶ 3]. Dr. Ingram was a voluntary (unpaid) attending physician and member of the faculty of NYMC, who accepted faculty assignments within the Department of Psychiatry and Behavioral Sciences, and the Division of Psychoanalytic Training. [Pl.Ex. 81 at 11]. Dr. Ingram was appointed to the NYMC faculty in 1985. [Pl.Ex. 17 at 110]. As a member of the faculty, Dr. Ingram taught didactic courses and provided training analysis to candidates. [Pl.Ex. 5 at 132]. Dr. Ingram provided psychoanalytic services to Dr. DeMasi at a reduced rate which NYMC set and DeMasi paid. [Pl.Ex. 81 at 12]. Dr. Ingram was obligated to disclose to NYMC,

(A) whether the candidate was undergoing the personal psychoanalysis required by the Division of Psychoanalytic Training.

(B) whether the candidate was prepared to take on analysis of his own patients, and

[C] whether the candidate was prepared for certification as a psychoanalyst.

[Pl.Ex. 81 at 12].

Candidates of the Psychoanalytic Division were required to undergo training psychoanalysis conducted by a NYMC faculty member. [Pl.Ex. 17 at 62]. The Psychoanalytic Institute required that candidates attend analytic training sessions three times per week with the training analyst responsible for advising NYMC whether the student was attending. [Pl.Ex. 17 at 106, Ex. 81 at 12]. DeMasi was the first candidate from the Psychoanalytic Institute that Dr. Ingram saw for training analysis after his appointment to the *NYMC* faculty. [Pl.Ex. 17 at 111–12]

Dr. Ingram never reported to NYMC that DeMasi's psychoanalysis had ceased, he never advised NYMC that DeMasi was not prepared to analyze his own patients and he never indicated that DeMasi should not be certified.

### R. Joseph DeMasi

R. Joseph ("Rick") DeMasi, a psychiatry resident at New York Medical College, elected to pursue the study of psychoanalysis. [Doc. # 223 at 2]. Training in psychoanalysis was not mandatory in order for a resident to become a psychiatrist, but was mandatory to be a psychoanalyst. [Pl.Ex. 3 ¶ 5]. When a student enrolled in the Division of Psychoanalytic Training, analysis was a requirement. [Pl.Ex. 3 ¶ 6]. DeMasi's psychoanalysis began in 1985 and continued while DeMasi was a resident at Lenox Hill Hospital and later while he was assigned to Danbury Hospital in 1986. From July through approximately October 31, 1996, DeMasi was assigned to a rotation at the Danbury Hospital Outpatient

---

1. Upon certification, the Connecticut Supreme Court "agreed to decide whether, in the circumstances presented herein, psychotherapists undertaking the treatment of a psychiatric outpatient assumed a duty to exercise control over the patient to prevent the patient from committing an act of violence against a third person." *Fraser*, 236 Conn. 625, 674 A.2d 811.

2. This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 233] on February 23, 1998, with appeal to the Court of Appeals.

Considered were defendant's Motion for Summary Judgment [Doc. # 199], Memorandum in Support [Doc. # 184], Statement of Material Facts [Doc. # 85], plaintiff's Memorandum in Opposition [Doc. # 240], Statement of Disputed Facts [Doc. # 241], plaintiff's Exhibits 1–129, defendant's Reply Brief [Doc. # 111], and defendant's Reply to Plaintiff's Opposition dated December 31, 1997 [Doc. # 223].

Department, according to New York Medical College. [Pl.Ex. 72–75].

DeMasi testified that his training analysis by a NYMC faculty member was "supposed to be like any other therapy, confidential; yet on the other hand, they have to certify that I continue this analytic process. And furthermore, I—I learned later that there was some talk about particular individuals and problems that I had discussed in analysis." [Pl.Ex. 9 at 63]. He further testified that in early 1986 Dr. "Ingram made it clear that he was obligated by law to report suspicion of child abuse." [Pl.Ex. 9 at 64].

### The Disclosure

In May 1986, during a training analysis session, DeMasi disclosed to Dr. Ingram that DeMasi was a pedophile.[3] [Pl.Ex. 17 at 137]. Dr. Ingram recalled DeMasi had returned from a trip to South America.

> That in fact he had in mind in going to South America . . . that he would be interested in children . . . but perhaps he would find a little girl.
>
> And he wanted me to know that he loved children, he loved to take care of them, he wanted the best for them, but he also had very strong sexual feelings towards them. It was at this point that for me the room began to spin.
>
> And he went on and he described how it wasn't so very important whether they were little boys or little girls, but that it was very important to him and that he saw it as his right and the right of pedophiles everywhere to engage in this behavior.
>
> And as I am hearing this in this session I am [thinking] about my two little boys and I am thinking about how he was a child psychiatrist and he was with children all the time, and I was thinking about how very smart he is, he is a smart man, and how his intelligence is organized around getting what he wants and not letting anything stand in his way.

[Pl.Ex. 17 at 152–53]. Dr. Ingram testified that,

> at no time then or subsequently was I able to find out from [DeMasi] if he ever did

anything actually. But I know that this was something that he cared about as deeply as anybody could care about anything. And I knew that I had an obligation to society and to children everywhere. And also, paradoxically, to him. [Pl.Ex. 17 at 154]. Whether DeMasi had engaged in pedophilic activity, Dr. Ingram stated, "I was very uncertain what to believe . . . [s]o when he says 'not really', or when he slides away from the question, I [didn't] know how to understand that." [Pl.Ex. 17 at 162, 166]. Dr. Ingram further testified:

> He was now talking to me about what mattered to him most . . . [i]t was now clear that his training was organized around the function, around the purpose of his pedophilic impulse . . . [h]e loved children. And being a child psychiatrist that he would be in the company of children.

[Pl.Ex. 17 at 170].

"At the time of the disclosure . . .," Dr. Ingram said, "I virtually reeled with amazement at the horror of this and at what I was now engaged with, and what I would need to do." [Pl.Ex. 17 148–49]. DeMasi was the first pedophile that Dr. Ingram had ever treated. [Pl.Ex. 18 at 322–324].

After this disclosure, Dr. Ingram determined that psychoanalysis was not appropriate for treating DeMasi's pedophilia. [Pl.Ex. 18 at 143]. Dr. Ingram testified that,

> One would not treat a pedophile, particularly a pedophile with an insistent wish about pedophilia who argues—who argued then that pedophilia was acceptable. It would not be acceptable to treat such a man in psychoanalytic treatment of any kind.

[Pl.Ex. 17 at 144]. "[I]t was precisely because he wasn't struggling with it that I had the problem I did. He wasn't struggling with it. He was struggling with society which regarded it as an abomination." [Pl. Ex. 17 at 161].

Dr. Ingram testified that he told DeMasi that he could not "consider himself a psychoanalytic candidate, because he [was] not

---

**3.** Defendant provided the following definition for the criteria for diagnosing pedophilia. "The act or fantasy of engaging in sexual activity with prepubertal children is a repeatedly preferred or exclusive method of achieving sexual excitement." [Doc. # 223 at 3].

adequately struggling with these impulses." [Pl.Ex. 18 at 264]. Dr. Ingram never advised DeMasi to resign from the Psychoanalytic Division or his residency rotation at Danbury Hospital. [Pl.Ex. 18 at 264]. Dr. Ingram did not inform NYMC of his decision to cease psychoanalytic training sessions and to treat DeMasi with psychotherapy.

*Division of Psychoanalytic Training at NYMC*

The Psychoanalytic Division of NYMC is a division of the Department of Psychiatry at NYMC. [Pl.Ex. 79, 80]. A resident's decision to enter the Division of Psychoanalytic Training is voluntary. Among its four requirements for graduation and certification as a psychoanalyst, NYMC required "successful" or "satisfactory personal analysis." [Pl.Ex. 79 at 5, 8]. At NYMC, "psychiatric residents who are matriculated in the Division of Psychoanalytic Training are entitled to their personal analysis at a reduced fee." [Pl.Ex. 79 at 9]. The reduced fee arrangement was negotiated between the faculty member and NYMC. [Pl.Ex. 5 at 125–26].

First year candidates were required to begin personal analysis with a member of the Faculty of the Division of Psychoanalytic Training by November 1 of the first academic year, each student choosing his personal analyst and supervisors from the entire faculty roster. [Pl.Ex. 79 at 4]. The candidate was required to attend analysis three times per week; if he failed to attend analysis as required, "the analyst would drop him, and then he would be dropped from the ... institute." [Pl.Ex. 5 at 128, 131–32].

The Division of Psychoanalytic Training had no full-time faculty. "All the psychoanalytic faculty are analysts who practice, but they devote a certain amount of time for teaching and that makes them clinical faculty or voluntary faculty...." [Pl.Ex. 5 at 124].

The Psychoanalytic Division brochure explains that,

personal analysis with a training analyst of the Division of Psychoanalytic Training is a most important and essential aspect of the candidate's training. Often referred to as a "training analysis" or "didactic analysis" in the past, the personal analysis, to be successful, must of necessity be a therapeutic analysis as well. The student is expected to approach his analysis as a patient and to understand intellectually and emotionally his personal development, his relationship with the significant people of his past and present, and his psychodynamic style of life. He is expected to "work through" his conflicts and "blind spots" so that he can grow, not only as a therapist, but individually and as a member of the psychoanalytic community....

[Pl.Ex. 79 at 5]. "Analytic Supervision work may begin when the personal analysis has progressed to the point where the candidate has acquired emotional self-understanding to permit intensive work with patients." [Pl. Ex. 79].

Dr. Alfred Freedman, Chairman of the Department of Psychiatry at NYMC, described the purpose of the requirement for candidates [4] in the psychoanalytic program.

The purpose of—a training analysis as these were—would be to gain awareness of their own psyche; and comprehension of their interpersonal relations; their development of their life; and, their inter-relationships with work, other people, career; their aspirations.

Q: Towards what end?

A: For the—so that they would be better able to treat patients successfully.

[Pl.Ex. 7 at 27]. Faculty members assigned to the Division of Psychoanalysis provided training analysis to the candidates in the psychoanalytic division. [Pl.Ex. 7 at 29–30]. Dr. Babikian stated that the purpose of the training analysis

a little philosophical. It's the basis of training; however, it's part of the training. The purpose is that the analy[zed], the candidate, will come to know himself better so he will be better able to deal with this counter transference to patients and, therefore, be a better analyst.

Q. "Is there any other reason"

4. Both Dr. Babikian and Dr. Freedman referred to psychoanalytic residents as "candidates" and not "residents" or "patients." [Pl.Ex. 7 at 56, Ex. 8 at 136].

A. Not that I know of.

[Pl.Ex. 8 at 136].

Plaintiff's expert witness, Dr. Arthur Henry Green, testified that when he underwent training in psychoanalysis, he understood that,

> training analysis was, on the one hand, an opportunity for the candidate to understand more about his or her inner life, psychological motivations, to try to put together the candidate's early development with later psychological problems, to achieve a certain amount of personal growth, greater self knowledge of strengths, weaknesses, and basically served as a self—to increase the powers of self observation so that all of these newly gained qualities could be applied to his practice with other patients.

[Pl.Ex. 39 at 23].

In 1985–86, there was no Committee at the Division of Psychoanalytic Training to monitor a candidate's training analysis. [Pl.Ex. 8 at 144]. Instead, in 1985–86, NYMC relied exclusively on "the word of the analyst." "If the analyst says [the candidate is] ready to be, to graduate or to finish his analysis, that's what you say, that's it." [Pl.Ex. 8 at 145]. In 1985–86, NYMC's faculty training analysts were not required to give progress reports, [Pl.Ex. 8 at 148], but were responsible for documenting the hours that the candidate was in training analysis. [Pl.Ex. 8 at 151].

Dr. Green opined that the expectation of confidentiality in training analysis is "not complete" but "qualified".

> It would be a qualified yes, as I didn't have absolute confidence, but I had confidence that by and large what I was saying would be held confidential. But I also understood that it would be possible that if I would divulge certain problems or conflicts which would have precluded me from acting effectively as a future psychoanalyst, that something—that there may have been some communication from my training analyst to the Analytic Center, because I knew that in many cases, some of the—some of my colleague candidates had throughout—in the first couple of years in our training, were asked to leave the training program. Those—those trainees apparently, to my knowledge, did perform fairly well in the classroom work, so I would assume that something would have come up in their own analysis, which—a discovery of some kind of problem which probably their analysts would have conveyed to the committee, and that would be a reason for their being asked to leave.

[Pl.Ex. 39 at 26–27].

> [I]n my institute at that time, there were frequent conferences between the Academic Committee, the Training Committee and the Progression Committees.

> So that if a candidate was doing poorly—lets say major problems would have occurred, would have surfaced in the training analysis, the analyst in some cases would report this to the Training Committee, basically feeling that, well, at this point maybe the analyst needed some time off, or the prospective analyst, or maybe the candidate really was not suitable. After a certain amount of self exploration and probing, factors may have ... become evident which would have precluded this candidate from becoming an effective analyst.

[Pl.Ex. 39 at 24–25].

Dr. Green testified he considered his training analysis

> bona fide psychoanalytic treatment, but I was aware that since I was also in the dual position of being a candidate, and that in order to practice my intended profession of being a psychoanalyst, I realized that there were certain standards that would apply differently to me as a training analyst—as a candidate in psychoanalytic treatment than as if I were a non-candidate and just was in treatment—was in psychoanalysis with someone else with no regard to a training program. So I perceived a difference.

[Pl.Ex. 39 at 28].

By letter dated September 3, 1986, Dr. Babikian informed DeMasi that he was promoted to the third year at the Division of Psychoanalytic Training. [Pl.Ex. 21]. In 1985–86, promotion of candidates was determined at faculty meetings. At the meeting, faculty would "discuss each candidate, his attendance at class, in the class work. And

based on that, they either promote him or don't promote him." [Pl.Ex. 5 at 131]. Although the content of the training analysis was "never" divulged, it was incumbent upon the faculty analyst to report whether the candidate was attending analytic training and fulfilling his analysis requirement. [Pl.Ex. 5 at 132]. Dr. Ingram would have attended meetings to determine whether to promote Dr. DeMasi. [Pl.Ex. 5 at 132]. Dr. Babikian testified that he never received a report from Dr. Ingram that analytic training with De-Masi had ended in May 1986, or that DeMasi was failing to fulfill the analytic training requirement. [Pl.Ex. 5 at 132–33].

On September 17, 1986, Denny Almonte's parents took the ten year old to Danbury Hospital's Emergency Room for psychiatric treatment. There Denny came under the care and treatment of Dr. DeMasi. After his initial visit, Denny Almonte returned for out patient therapy at DeMasi's suggestion. Between September 17 and October 20, 1986, Denny Almonte saw DeMasi at the hospital six times. [Pl.Ex. 2]. On three or four visits, DeMasi sexually assaulted Denny during psychiatric play therapy sessions DeMasi called "hide and seek". [Pl.Ex. 2].

DeMasi did not meet with Dr. Ingram in August; he met with Dr. Ingram twice in September 1986. [Pl.Ex. 18 at 241].

By letter to Dr. Babikian, dated September 30, 1986, DeMasi requested "continuation in the Psychoanalytic division as a non-matriculated student." The "[r]eason for this is that I do not want to conflict with the requirements of the Division. I am currently in therapy only once weekly. Although I am attempting to make a thrice-weekly arrangement workable, I'd be relieved to continue now with non-matriculated status." [Pl.Ex. 24].

DeMasi was arrested on or about November 11, 1986.

*DISCUSSION*

Dr. Ingram now moves for summary judgment on Count V of the Second Amended Complaint, arguing that, based on the Second Circuit's 1994 *Fraser* decision and the Connecticut Supreme Court's 1996 *Fraser* decision, he did not have a duty to control or a duty to warn.[5]

In *Fraser v. United States,* 30 F.3d 18, 20 (2d Cir.1994) ("Fraser I"), the Second Circuit certified two questions to the Connecticut Supreme Court.

1. Does Connecticut recognize a general duty on the part of a psychotherapist to control a patient being treated on an outpatient basis in order to prevent harm to third persons?

2. If so, do the allegations of the complaint in the pending case, as amplified by the submissions of the plaintiff in opposition to the defendant's motion for summary judgment, present a triable jury issue?

*Id.* at 20, *cert. denied,* —— U.S. —— 117 S.Ct. 188, 136 L.Ed.2d 126 (1996). As to the requisite showing to establish a duty to warn, the Court, approving Judge Eginton's decision which found that foreseeability was a key factor in determining the existence of a duty to warn, opined, "in the absence of any objective indicia of a patient's propensity to cause harm, we are unwilling to conclude that, under Connecticut tort law, a claim alleging a breach of duty to warn should reach a jury. . . ." *Id.* at 19.

■ After reviewing the record and subsequent case law, this Court agrees with Judge Nevas that this case is distinguishable from *Fraser* on a number of grounds. First, the relationship between Dr. Ingram and DeMasi cannot be characterized as strictly that of a psychiatrist-voluntary patient. *Almonte v. New York Medical College,* 851 F.Supp. 34, 40 (D.Conn.1994). Because Dr. "Ingram was DeMasi's instructor as well as his analyst, he had a control mechanism over DeMasi that does not exist in the usual analyst-voluntary patient relationship." *Id.* Indeed, the jury could find, based on the evidence, that Dr. Ingram, in his capacity as DeMasi's training analyst, "had feasible and not unreasonably burdensome mechanisms for control available to him." *Id.* (citing *Kaminski v. Fairfield,*

---

5. Dr. Ingram also argues that Connecticut public policy supports protecting the confidentiality of the psychiatric patient's communications. *See* Conn.Gen.Stat. § 52–146f(2) ("Communications or records may be disclosed when the psychiatrist determines that there is substantial risk of imminent physical injury by the patient to himself or others.").

216 Conn. 29, 35, 578 A.2d 1048 (1990); *Tarasoff v. Regents of the Univs. of Cal.*, 17 Cal.3d 425, 551 P.2d 334, 342, 131 Cal.Rptr. 14, 20 (1976)).

Even without breaching the confidentiality of DeMasi's communications, as an instructor, Dr. Ingram was authorized to notify NYMC that: (1) DeMasi was not engaging in training analysis for certification, as required; (2) DeMasi had revealed information which made him unsuitable for psychoanalytic training; and (3) NYMC would be advised to review whether DeMasi should remain in the residency program practicing child psychiatry. Indeed, the requirements of the program placed on Dr. Ingram the responsibility of certifying DeMasi's fitness to remain in at least the psychoanalytic program. The record reveals that Dr. Ingram did not take any steps to advise NYMC that the training analysis was not progressing satisfactorily, that DeMasi should not be certified as a psychoanalyst, or that DeMasi should not be treating children. [Pl.Ex. 18 at 322], while providing an ample basis upon which to conclude, as Judge Nevas found, that there are "adequate grounds upon which to find that Dr. Ingram had a duty to warn." *Id.* at 41.

■ "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated the duty in the particular situation at hand." *Zamstein v. Marvasti*, 240 Conn. 549, 692 A.2d 781, (1997) (quoting *R.K. Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994)). In *Fraser v. United States*, 236 Conn. 625, 674 A.2d 811 (1996) ("Fraser II"), the Connecticut Supreme Court held that a psychotherapist had *no* duty to control an outpatient not known to be dangerous from inflicting bodily harm on a victim who was neither identifiable nor within a foreseeable class of victims.[6]

■ Dr. Ingram argues that "it is clear that Denny Almonte was not an identifiable victim," nor can it "be seriously contended that Dr. Ingram had any reason to know that Dr. DeMasi posed a risk to Denny Almonte at the time he treated him." [Def. Mem at 5]. Under Connecticut law,

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised ... By that is not meant that one charged with negligence must be found *actually* to have foreseen the probability of harm or that the *particular* injury which resulted was foreseeable, but the test is, would the ordinary person in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

*Clohessy v. Bachelor*, 237 Conn. 31, 45, 675 A.2d 852 (1996) (emphasis added).

Plaintiff strongly contests the issue of foreseeability,[7] contending that "[n]ot only was Denny among a class of identifiable victims, Denny was in fact identified for educational training purposes." [Doc. # 240 at 5]. It is undisputed that DeMasi articulated a specific threat to harm children in telling Dr. Ingram about his pedophilic urges and impulses. The record establishes that Dr. Ingram knew that DeMasi intended to become a child psychiatrist, that DeMasi might be assigned to treat children during a clinical rotation in the residency program, that DeMasi was not conflicted, guilty or concerned about his sexual desire for children, that DeMasi believed society was wrong to disparage pedophilia and that DeMasi repeatedly argued the merits of the practice to Dr. Ingram. Although Dr. Ingram maintains that he was unsure whether DeMasi had acted on his impulses, plaintiff also provided expert testimony on pedophilia and a pedophile's propensity to act on his impulses and to be dishonest about his behavior. [Doc. # 241 at 50–54].

Based on the evidence, a jury could reasonably conclude that Denny Almonte, one of DeMasi's patients (during his clinical rotation), was within a foreseeable class of victims to whom Dr. Ingram might owe a duty of care arising from DeMasi's disclosure.

---

**6.** The Court specifically declined to answer the broader question of whether the relationship between a psychotherapist and an outpatient is properly characterized as the kind of special relationship that imposes on the psychotherapist a duty to control the behavior of the outpatient. *Fraser II*, 236 Conn. at 629–30, 674 A.2d 811.

**7.** Plaintiff submitted 129 exhibits in opposition to summary judgment.

The issue of foreseeability is a disputed one, properly reserved for the trier of fact.

 Finally, defendant argues that public policy, codified in Conn.Gen.Stat. § 52–146f(2),[8] dictates that confidentiality be maintained. He argues that "[i]f a psychiatrist is forced to warn others of every fantasy revealed by patients in the context of therapy, in the absence of any intent to act upon the fantasy, then no patient will seek treatment for pedophilia or any other potentially stigmatizing affliction." [Doc. # 233]. As discussed earlier in this opinion, the training analysis in which DeMasi engaged with Dr. Ingram did not confine itself to a traditional psychiatrist-patient relationship. The statutory context that defendant urges upon the Court from § 52–146f(2) may, therefore, not govern here. Even if it did, the existence of a "substantial risk of imminent physical injury" is a disputed issue of fact.

Plaintiff counters that public policy dictates that psychiatrists report actual and suspected child abuse. In *Zamstein v. Marvasti*, the Connecticut Supreme Court concluded "that imposing upon mental health professionals, who have been engaged to evaluate whether there has been sexual abuse, a duty of care running to the benefit of the alleged sexual abuser would be contrary to the public policy of the state." 240 Conn. at 559, 692 A.2d 781. The *Zamstein* Court found that the legislature had already expressed the "strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse to the appropriate authorities and agencies." *Id.* at 559, 692 A.2d 781 (citing Conn.Gen.Stat. § 17a–101(a–h)).

 The Court need not choose between these dueling policies since, under both of them, a psychiatrist has a duty to speak where harm to identifiable victims is a foreseeable consequence of his silence. While defendant argues there "was no one to warn and there was nothing to warn about," the Court cannot so find as a matter of law on this record. These are determinations which must be made by a jury.

8. Section 52–146f(2) states in pertinent part, "Communications or records may be disclosed when the psychiatrist determines that there is

*CONCLUSION*

Accordingly, Dr. Ingram's Motion for Summary Judgment [Doc. # 199] is **DENIED.**

substantial risk of imminent physical injury by the patient to himself. . . ." Conn.Gen.Stat. § 52–146f(2).