ANNE MULLEN *v.* JOSEPH A. HORTON ET AL.
(AC 15380)

O'Connell, C. J., and Heiman and Schaller, Js.

---

Argued January 28—officially released September 23, 1997

*Susan K. Smith*, for the appellant (plaintiff).

*Joseph T. Sweeney*, with whom were *James F. Shea* and, on the brief, *James M. Sconzo*, for the appellees (defendant Missionary Oblates of Mary Immaculate, Inc., of New Hampshire et al.).

*Opinion*

HEIMAN, J. The plaintiff appeals from the trial court's rendering of summary judgment in favor of the defendants. On appeal, the plaintiff claims that the trial court improperly determined that no genuine issue of material fact exists as to whether the defendants, Missionary Oblates of Mary Immaculate, Inc., of New Hampshire and Franco-American Oblate Fathers, Inc., (Oblate institutional defendants) are vicariously liable for the defendant priest's actions under (1) the doctrine of

respondeat superior or (2) the doctrine of apparent authority.[1] We agree with the plaintiff and reverse the judgment of the trial court.

The following facts are necessary for a proper resolution of this appeal. The defendant, Joseph A. Horton, was a practicing Roman Catholic priest, ordained by and an agent of the Oblate institutional defendants. Horton was also a practicing psychologist. He maintained an office at the defendant Center for Individual and Group Therapy, P.C., in Vernon (therapy center). Given Horton's vow of poverty, he gave all of the profits he derived from his psychology practice to the Oblate institutional defendants.

In 1988, Horton was assigned weekly priestly duties at Saint Matthew's Church in Tolland, where the plaintiff was a parishioner. In August, 1988, the plaintiff sought the professional care and treatment of Horton for psychological, emotional and marital problems. Specifically, she sought counseling from Horton because of his joint status as a psychologist and a Roman Catholic priest associated with her parish.

Horton provided the plaintiff with a combination of pastoral, spiritual and psychological counseling, including psychological discussions, spiritual advice and prayer. The plaintiff received counseling from Horton both at his office at the therapy center, and at his office at the Immaculata Retreat House in Willimantic, a house owned and operated by the Oblate institutional defendants. Beginning in February, 1989, Horton and the

---

[1] The plaintiff also argues that the trial court improperly rendered summary judgment on her Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; and professional negligence claims. Both the CUTPA and professional negligence claims, however, are fundamentally based on the Oblate institutional defendants' being held vicariously liable for the defendant priest's actions. Thus, our resolution of the vicarious liability claim is dispositive of the CUTPA and professional negligence claims.

plaintiff began a sexual relationship, with sexual contact taking place during the counseling sessions. Horton continued to bill the plaintiff and her insurance company for these counseling sessions in which sexual contact occurred. Sexual contact between Horton and the plaintiff also occurred at church retreats, sponsored and run by the Oblate institutional defendants, where Horton was serving as retreat faculty. Horton and the plaintiff's sexual relations continued for approximately two and one-half years, terminating in February, 1992.

About December 16, 1993, the plaintiff filed a seven count complaint against the defendants. On October 31, 1994, the Oblate institutional defendants filed a motion for summary judgment, arguing that there was no genuine issue of material fact as to whether the Oblate institutional defendants were vicariously liable for Horton's alleged misconduct under either the doctrine of respondeat superior or the doctrine of apparent authority. Attached to their motion for summary judgment were three sworn affidavits of Oblate priests, and a portion of the plaintiff's deposition. In opposition to the motion for summary judgment, the plaintiff filed her sworn affidavit, a portion of her deposition, and an affidavit of Anne C. Pratt, a licensed Connecticut psychologist. On October 18, 1995, the trial court granted the Oblate institutional defendants' motion for summary judgment. This appeal followed.

I

The plaintiff first argues that the trial court improperly determined that no genuine issue of material fact exists as to whether the Oblate institutional defendants are vicariously liable for Horton's actions under the doctrine of respondeat superior. In response, the Oblate institutional defendants argue that because the laws of the Roman Catholic Church and the rules of the Oblate Order expressly prohibit priests from engaging in sexual

activity, Horton's alleged sexual exploitation of the plaintiff could not be within Horton's scope of employment, nor could it be viewed as a furtherance of the Oblate institutional defendants' business. We agree with the plaintiff.

"We initially note the standard of review of a trial court decision granting a motion for summary judgment. Practice Book § 384 mandates that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A material fact is a fact that will make a difference in the result of the case. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *Budris* v. *Allstate Ins. Co.*, 44 Conn. App. 53, 56–57, 686 A.2d 533 (1996). "[A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Internal quotation marks omitted.) *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 752, 660 A.2d 810 (1995).

Thus, in order to prevail on her challenge to the summary judgment, the plaintiff must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact as to whether the Oblate

institutional defendants are vicariously liable for Horton's actions, under the doctrine of respondeat superior. "Under the doctrine of respondeat superior, [a] master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business. . . . A servant acts within the scope of employment while engaged in the service of the master, and it is not synonymous with the phrase during the period covered by his employment. . . . While a servant may be acting within the scope of his employment when his conduct is negligent, disobedient and unfaithful . . . that does not end the inquiry. Rather, the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business . . . . Unless [the employee] was actuated at least in part by a purpose to serve a principal, the principal is not liable." (Citation omitted; internal quotation marks omitted.) *Glucksman* v. *Walters*, 38 Conn. App. 140, 144, 659 A.2d 1217, cert. denied, 235 Conn. 914, 665 A.2d 608 (1995).

"When the servant is doing or attempting to do the very thing which he was directed to do, the master is liable, though the servant's method of doing it be wholly unauthorized or forbidden. If the servant's disobedience of instructions will exonerate the master, the proof, easily made, virtually does away with the maxim of respondeat superior. . . . That the servant disobeyed the orders of the master is never a sufficient defense. It must be shown further that he ceased to act for the master and in the course of his employment." (Citation omitted; internal quotation marks omitted.) *Son* v. *Hartford Ice Cream Co.*, 102 Conn. 696, 700–701, 129 A. 778 (1925).

"Ordinarily, it is a question of fact as to whether a wilful tort of the servant has occurred within the scope

of the servant's employment and was done to further the master's business. . . . But there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." (Citation omitted; internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 207, 579 A.2d 69 (1990).

Viewing the evidence before it in the light most favorable to the plaintiff, the trial court could have reasonably found the following. The Oblate institutional defendants employed Horton to give pastoral counseling to parishioners, in conjunction with his other priestly duties. The Oblate institutional defendants also employed Horton as a staff psychologist for the annulment tribunal and at a number of religious retreats sponsored by the Oblate institutional defendants. The Oblate institutional defendants enabled Horton to counsel both church personnel and the public at large, by giving him an office in their retreat house. The Oblate institutional defendants benefited from Horton's pastoral and psychological counseling of their parishioners and clerical personnel. They also benefited monetarily from his clinical psychology practice, because all profits derived from his practice were given to the Oblate institutional defendants pursuant to his vow of poverty. Thus, a trier of fact could reasonably find that Horton's pastoral and psychological counseling of the plaintiff was well within the scope of his employment for the Oblate institutional defendants and was in furtherance of the Oblate institutional defendants' business.

Horton's alleged sexual exploitation of the plaintiff occurred during his church sanctioned pastoral-psychological counseling sessions and while he staffed church retreats. Thus, a trier of fact could reasonably determine that Horton's sexual relationship with the plaintiff was a misguided attempt at pastoral-psychological counseling, or even an unauthorized, unethical, tortious method

of pastoral counseling, but not an abandonment of church business.

Furthermore, a trier of fact could reasonably find that the sexual relations between Horton and the plaintiff directly grew out of, and were the immediate and proximate results of, the church sanctioned counseling sessions. According to the affidavit of the clinical psychologist, Anne Pratt, sexual relations often mistakenly arise out of an emotional therapeutic relationship. This is known as the transference-countertransference phenomenon. Pratt further opined in her affidavit that a transference-countertransference phenomenon arose between the plaintiff and Horton, with the emotional nature of the therapeutic relationship causing the parties to displace feelings and confuse the therapeutic relationship with an intimate sexual relationship.

The present case is similar to *Glucksman* v. *Walters*, supra, 38 Conn. App. 140, and *Pelletier* v. *Bilbiles*, 154 Conn. 544, 227 A.2d 251 (1967). In *Glucksman* v. *Walters*, supra, 142–43, a part-time Young Men's Christian Association (YMCA) employee responded to a foul in a YMCA basketball game by severely assaulting the man who had fouled him. We concluded that a jury could have reasonably characterized this assault as "a misguided effort" at maintaining order on the YMCA basketball court and, accordingly, we reversed a directed verdict holding the YMCA not vicariously liable for the assault on the basis of respondeat superior. Id., 145–48.

In *Pelletier* v. *Bilbiles*, supra, 154 Conn. 544, an employee of a confectionery store, charged with keeping order in the store, assaulted a customer who had thrown a wrapper on the floor. Our Supreme Court held that "[t]he beating of an unruly customer . . . is an extremely forceful, although misguided, method of discouraging patrons of the [store] . . . from causing disturbances on the premises in the future. The fact that

the specific method a servant employs to accomplish his master's orders is not authorized does not relieve the master from liability. . . . Also, the fact that the battery . . . may have been motivated by personal animosity . . . does not exonerate the defendant. . . . A master does not escape liability merely because his servant loses his temper while he is conducting the master's business." (Citations omitted.) Id., 548.

Here, as in *Glucksman* and *Pelletier*, the trier of fact could reasonably have found that Horton's sexual relations with the plaintiff during their pastoral-psychological counseling sessions, were a "misguided effort" at psychologically and spiritually counseling the plaintiff, rather than an abandonment of the counseling. Just as the YMCA employee's assault on the basketball court in *Glucksman*, and the employee's assault on the customer who had littered in *Pelletier* represented extreme and clearly unauthorized methods of maintaining order and thereby furthering their employers' business, Horton's engaging in sexual contact with the plaintiff during counseling sessions also could represent an extreme and clearly unauthorized method of spiritually and emotionally counseling the plaintiff and thereby furthering the church's business. "The fact that the specific method a servant employs to accomplish his master's orders is not authorized does not relieve the master from liability." Id., 548.

The Oblate institutional defendants argue that this case is governed by *Gutierrez* v. *Thorne*, 13 Conn. App. 493, 537 A.2d 527 (1988), *Brown* v. *Housing Authority*, 23 Conn. App. 624, 583 A.2d 643 (1990), cert. denied, 217 Conn. 808, 585 A.2d 1233 (1991), *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 216 Conn. 200, and *Nutt* v. *Norwich Roman Catholic Diocese*, 921 F. Sup. 66 (D. Conn. 1995). We are unpersuaded, however, and conclude that the present case is distinguishable from these cases.

In *Gutierrez* v. *Thorne*, supra, 13 Conn. App. 496–97, an employee of the commissioner of mental retardation was hired to help retarded persons living in the supervised apartment program with keeping up their apartments, grocery shopping, expense budgeting and performing other aspects of daily living. The employee entered the retarded plaintiff's apartment and repeatedly sexually assaulted her. Id. We affirmed a summary judgment in favor of the employer, the commissioner of mental retardation, holding that "it is clear that [the employee] . . . was engaging in criminal conduct which had no connection to the defendant's business of providing supervision and training to mentally retarded persons regarding daily living skills. Since there were no facts before the court from which it could conclude that [the employee] was furthering the defendant's interests, the defendant's nonliability under a respondeat superior theory was properly determined as a matter of law." Id., 499.

In *Gutierrez*, unlike here, a trier of fact could not reasonably have determined that the employee's brutal rape of the retarded plaintiff in her shower was merely a negligent or misguided attempt at supervising her shopping, cleaning, budgeting and daily living. A trier of fact could not reasonably have determined that the employee's rape of the retarded plaintiff constituted merely an extreme, unauthorized and disobedient method of supervising her daily living. Rather, the employee's brutal sexual assault of the plaintiff was clearly an abandonment of his supervising duties.

In *Brown* v. *Housing Authority*, supra, 23 Conn. App. 624, a mechanic was driving his employer's van from one maintenance job to another when the plaintiff asked the employee to move his van, which was blocking traffic. The employee refused to move the van, and the plaintiff drove away. The employee then left his job route and followed the plaintiff's car. The employee

found the plaintiff and rear-ended his car several times. The plaintiff got out of his vehicle, and the employee grabbed a hammer and struck the plaintiff in the chest. Id.

A trier of fact could not reasonably find that the *Brown* employee's abandonment of his maintenance mechanic job responsibilities to pursue and assault the plaintiff was a negligent or misguided effort at maintaining machines, or even an extreme method of traveling from one maintenance mechanic job to another, because "the employee necessarily abandoned his employer's business to pursue and attack the plaintiff." *Glucksman* v. *Walters*, supra, 38 Conn. App. 148. The employee's "intentional, criminal acts were in no way connected to the defendant's business." *Brown* v. *Housing Authority*, supra, 23 Conn. App. 628.

The defendants and the dissent rely on *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 216 Conn. 200. In that case Pepperidge Farm entered into a consignment agreement with Anthony Spinelli, granting him an exclusive franchise to distribute Pepperidge Farm bakery products within a specified geographical area. Id., 204. Spinelli began defrauding certain independent grocery stores by charging the stores for goods he did not deliver. Id. Pepperidge Farm was unaware of Spinelli's scheme and never received any money as a result of it. Id., 205. Spinelli argued that Pepperidge Farm benefited from his fraud because the fraud caused a larger portion of shelf space to be devoted to Pepperidge Farm bakery products, thereby stimulating demand and increasing the likelihood of sales. See id., 207–208. The Supreme Court concluded, however, that "any possible indirect benefit Pepperidge Farm might have received by the increased shelf space was so de minimis that, as a matter of law, it [did] not support a conclusion that Spinelli acted within the scope of his employment and in furtherance of Pepperidge Farm's business." Id., 209.

*A-G Foods, Inc.*, is distinguishable from the present case. First, Pepperidge Farm did not benefit monetarily or otherwise from Spinelli's fraudulent scheme. Here, however, the Oblate institutional defendants did benefit monetarily from Horton's misguided counseling of the plaintiff. Second, Spinelli's intricate, complicated and well thought out fraud scheme could not reasonably be characterized as a misguided or negligent attempt at furthering the distribution of Pepperidge Farm products.

The dissent relies heavily on *Nutt* v. *Norwich Roman Catholic Diocese*, supra, 921 F. Sup. 66. First, while a federal District Court opinion is persuasive authority, it is not binding on this court. More importantly, however, *Nutt* is factually distinguishable from the present case. In *Nutt*, a parish priest showed pornographic movies to two twelve year old altar boys. Id., 69–70. Then, during various out-of-town trips, the priest repeatedly sexually molested the two minor boys, for a period of over six years. Id. The federal District Court granted the Roman Catholic institutional defendants' motion for summary judgment, holding that they could not be held liable for the defendant priest's actions under a doctrine of respondeat superior. Id., 70–71.

While a trier of fact could reasonably find that consensual sexual relations between two adults arising out of emotional, spiritual church sponsored counseling sessions represented a negligent and misguided effort at pastoral counseling, a trier of fact could *not* reasonably find that a priest's showing pornographic films to young boys and then criminally sexually molesting them in out-of-town motel rooms merely represented a negligent and misguided effort at pastoral counseling. The facts of *Nutt* clearly represent a situation in which the priest wholly abandoned his pastoral duties. Thus, *Nutt* represents one of those exceptional cases in which the servant's digression from duty is so clear cut that the

disposition of the case is a matter of law. See *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 216 Conn. 207.

Therefore, on close examination of the specific facts of this case in light of the relevant case law, we conclude that whether Horton's actions constituted a negligent, disobedient and unfaithful conducting of church business or a complete abandonment of church business represents an issue about which reasonable minds could differ, and thus constitutes a genuine issue of material fact. Thus, we conclude that the trial court improperly granted the Oblate institutional defendants' motion for summary judgment.

II

The plaintiff next argues that the trial court improperly found that no genuine issue of material fact exists as to whether the Oblate institutional defendants are vicariously liable for Horton's actions under the doctrine of apparent authority. Specifically, the plaintiff argues that the Oblate institutional defendants held Horton out to the public as a trustworthy, ethical, respectable priest-clinical psychologist, and the plaintiff relied on this representation in choosing to go to Horton for counseling and in trusting and confiding in Horton during the counseling process. Thus, under the doctrine of apparent authority, the Oblate institutional defendants should be vicariously liable for Horton's negligent, misguided and unethical behavior during his counseling sessions with the plaintiff.

In other states, the doctrine of apparent authority has been used to hold a principal, who represents that another is his servant or agent and thereby causes a third person to rely justifiably on the care or skill of such agent, vicariously liable for harm caused to the third person by the lack of care or skill of his servant or agent. See 1 Restatement (Second), Agency § 267, pp. 578–79 (1958); see also *Mehlman* v. *Powell*, 281 Md.

269, 272–75, 378 A.2d 1121 (1977); *Sanders* v. *Rowan*, 61 Md. App. 40, 50–58, 484 A.2d 1023 (1984); *McClellan* v. *Health Maintenance*, 413 Pa. Super. 128, 135–39, 604 A.2d 1053 (1992). In Connecticut, however, the doctrine of apparent authority has never been used in such a manner. Thus, because we are bound by Connecticut precedent; see *Conway* v. *Wilton*, 238 Conn. 653, 658–59, 680 A.2d 242 (1996); *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 195, 676 A.2d 831 (1996); we conclude that the doctrine of apparent authority is inapplicable to this case.

The judgment is reversed and the case is remanded with direction to deny the motion for summary judgment and for further proceedings in accordance with this opinion.

In this opinion O'CONNELL, C. J., concurred.

SCHALLER, J., dissenting. Although I agree with part II of the majority opinion, I disagree with the conclusion in part I. I would affirm the trial court's determination that, as a matter of law, the Oblate institutional defendants are not liable under the doctrine of respondeat superior. When the facts presented by the parties' affidavits are viewed in their proper context, it is clear that the defendant Joseph A. Horton's "digression from duty is so clear-cut that the disposition of the case becomes a matter of law." (Internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 207, 579 A.2d 69 (1990).

The facts that the majority recites from the record present a partial image of the situation. There are, however, other facts and allegations by the plaintiff that are necessary to present a complete factual picture. Those allegations and facts were before the trial court for summary judgment purposes. In this regard, it is important to note that the plaintiff acknowledged the

complete *incompatibility* and *inconsistency* of Horton's relationship with her vis-a-vis his role as a priest, by alleging in her complaint: "On several occasions . . . Horton told the plaintiff he was going to leave the priesthood in order to continue and further their intimate relationship."

In addition, the plaintiff testified at her deposition that starting about March, 1989, and continuing until early 1992, Horton and the plaintiff had discussions about their getting married and his having to make a decision to leave the priesthood in order to marry her. In his deposition, Horton confirmed that the plaintiff had suggested that they get married and never tell anybody about their being married while he remained a priest, but he said that he could not do it that way. On a number of occasions, the plaintiff acknowledged that she and Horton engaged in sexual intercourse on occasions when she invited him into her home. She acknowledged further her active role in their romantic relationship in testifying that she purchased and provided certain materials for him to use most of the time when they engaged in sexual intercourse.

The plaintiff further admitted that during all of her relationship with Horton, she understood that it was clearly outside the scope of any Catholic priest's employment to engage in sexual relations with anyone. The plaintiff admitted that Horton's engaging in sexual relations with her was certainly not for the purpose of promoting any of the work of the Catholic Church. She further recognized that Horton, like every other Catholic priest, was under a vow to abstain from sexual activity and she had no reason to believe that he had ever been excused or relieved of that obligation to abstain from sexual activity.

Additional relevant, undisputed facts were presented by the Oblate institutional defendants pertaining to Horton's activities: (1) At all times, the laws and standards

of the Roman Catholic Church and the Rules of the Oblate Order, as well as each priest's personal commitment to celibacy, have expressly prohibited each priest member of the Oblate Order from engaging in any sexual activity of any kind and from seeking or maintaining any personally intimate relationship or marital relationship with any woman; (2) At all times, any and all attempted or actual sexual activity or personally intimate relationship or marital relationship, which any priest member of the Oblate Order may have sought or maintained with any woman during that time frame, would have been clearly outside the scope of any employment which that person might possibly have held as a Catholic priest or as a member of the Oblate Order; (3) During the course of the plaintiff's relationship with Horton, Horton held nonecclesiastical employment as a clinical psychologist that was not related to any program sponsored or operated by the Oblate Order, and, during that time frame, he was also free personally to contract to render priestly services for and at local parish churches, which priestly services were also not related to any program sponsored or operated by the Oblate Order.

These additional facts and admissions by the plaintiff, when considered with the facts recited in the majority opinion, present a more complete factual picture of the situation and cast doubt on the majority's characterization of the parties' long-standing intimate relationship as merely "an extreme and clearly unauthorized method of spiritually and emotionally counselling the plaintiff and thereby furthering the church's business."

Horton's participation in this consensual relationship, which was even carried on in the plaintiff's home, and which involved proposals of marriage, with Horton either concealing it and remaining in the church, or leaving the church entirely, could not reasonably be construed as simply an errant and misguided method

of carrying out his counseling mission. The full factual context represents a vivid picture of an unrelated, independent, intimate, romantic relationship that both parties recognized was far beyond the permissible scope of Horton's priestly role. The fact that the parties may have met, and the relationship may have commenced, in the course of counseling is not sufficient to activate the doctrine of respondeat superior with respect to the Oblate institutions from which Horton concealed his impermissible relationship. Under these facts, Horton's action in conducting this relationship with the plaintiff represented a complete departure from his responsibilities to the Oblate institutional defendants. His long-standing, independent relationship with the plaintiff in no way furthered the interests of his employers. Like the trial court, we should be extremely hard pressed under these facts to find that the business of the Oblate institutional defendants was furthered by the activities attributed to Horton.

As the majority acknowledges, "[o]rdinarily, it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment and was done to further his master's business. . . . But there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." (Citation omitted; internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 216 Conn. 207. This case is controlled by our Supreme Court's decision in *A-G Foods, Inc.* Specifically, in that case the Supreme Court upheld the trial court's determination that "any possible indirect benefit Pepperidge Farm might have received by the increased shelf space [allocated to Pepperidge Farm because of Spinelli's overstated sales] was so de minimis that, as a matter of law, it does not support a conclusion that Spinelli acted within the scope of his employment and in furtherance of Pepperidge Farm's

business." Id., 209. Pepperidge Farm benefited basically from Spinelli's actual sales to A-G Foods, Inc. Similarly, even though the Oblate institutional defendants may have received some monetary benefit from Horton's authorized counseling work, there is no factual showing that it benefited specifically from the activities associated with the intimate relationship that Horton carried on with the plaintiff during the same time period as the counseling activity was occurring. Furthermore, the Supreme Court in *A-G Foods, Inc.*, determined that, even though the fraudulent transactions took place at the stores and during the hours when Spinelli was engaged in selling Pepperidge Farm merchandise, that is not sufficient to support the conclusion that he was acting within the scope of his employment. "Unless Spinelli was actuated at least in part by a purpose to serve a principal, the principal is not liable." (Internal quotation marks omitted.) Id., 210. Similarly, the facts in the present case indicate simply that Horton was motivated to serve his own interest, not that of the Oblate institutional defendants, whose most fundamental rules he violated by his conduct, and with full knowledge and acquiescence on the part of the plaintiff. The situation in *A-G Foods, Inc.*, is directly analogous to the present situation. The speculation contained in the affidavit of one witness in this case that some sort of transference-countertransference may have occurred is no more significant a factor than the factor of the enhanced shelf space that may have resulted from Spinelli's activities.

The majority relies on *Glucksman* v. *Walters*, 38 Conn. App. 140, 144, 659 A.2d 1217, cert. denied, 235 Conn. 914, 665 A.2d 608 (1995), and *Pelletier* v. *Bilbiles*, 154 Conn. 544, 547, 227 A.2d 251 (1967), to support its interpretation of Horton's activities as merely misguided and unauthorized methods of counseling. Those cases are distinguishable. In both cases, the actions

complained of represented an inappropriate and enlarged version of what would have been appropriate activity to maintain order and prevent disturbances. Neither case is persuasive. *Gutierrez* v. *Thorne,* 13 Conn. App. 493, 498–99, 537 A.2d 527 (1988), and *Brown* v. *Housing Authority,* 23 Conn. App. 624, 583 A.2d 643 (1990), cert. denied, 217 Conn. 808, 585 A.2d 1233 (1991), on the other hand, support the trial court's decision in this case. In both cases, the improper activity represented a departure from an appropriate course of conduct.

In the present case, Horton's activity was as much a departure from appropriate counseling activity as Spinelli's fraudulent sales activity was a departure in *A-G Foods, Inc.* Moreover, the decision in *Nutt* v. *Norwich Roman Catholic Diocese,* 921 F. Sup. 66 (D. Conn. 1995) is highly persuasive. Horton's alleged actions in engaging in improper sexual activity no more furthered the interests of the Oblate institutional defendants than did that of the parish priest in *Nutt.* See also *Tichenor* v. *Roman Catholic Church of Archdiocese of New Orleans,* 32 F.3d 953, 960 (5th Cir. 1994) ("[i]t would be hard to imagine a more difficult argument than that [Horton's] illicit sexual pursuits were somehow related to his duties as a priest or that they in any way furthered the interests of . . . his employer").

I would affirm the decision of the trial court granting summary judgment in this case.

For the foregoing reasons, I respectfully dissent.