## TRACY BEACH *v.* RAYMOND J. JEAN ET AL.

Superior Court       Judicial District of      File No. CV990087997S
Middlesex at Middletown

---

Memorandum filed November 18, 1999

*Van A. Starkweather*, for the plaintiff.

*Lynch, Traub, Keefe & Errante*, for the named defendant.

*Halloran & Sage*, for the defendants Norwich Roman Catholic Diocesan Corporation and Notre Dame Church Corporation of Durham.

I

INTRODUCTION

SCHUMAN, J. The plaintiff, Tracy Beach, has filed suit against the named defendant, the Reverend Father Raymond J. Jean, the defendant Norwich Roman Catholic Diocesan Corporation (diocese) and the defendant Notre Dame Church Corporation of Durham (Notre Dame Church), alleging that Jean, while a Roman Catholic priest, committed numerous acts of sexual assault, sexual abuse and sexual exploitation against the plaintiff between 1973 and 1982, while the plaintiff was a minor. The plaintiff alleges that the diocese and Notre Dame Church were negligent in various ways as Jean's employer. The diocese and Notre Dame Church move for summary judgment. For the reasons stated below, the court grants the motion.

## II

## BACKGROUND

The complaint is in nine counts. The first four counts are against Jean. They allege that, in 1973, when the plaintiff was nine years old, the plaintiff began actively participating in church youth activities at Notre Dame Church under the supervision of Jean, who was pastor. Jean allegedly befriended the plaintiff and took him on trips to various locations such as the beach. Beginning with an incident at the church rectory in 1973, Jean allegedly subjected the plaintiff to acts of sexual abuse. These acts allegedly continued on a regular basis in the rectory and occasionally on outings through 1984.[1] The plaintiff claims that these acts caused severe emotional harm and he, therefore, seeks compensatory and punitive monetary damages.

Counts five through nine of the complaint seek damages against the diocese and Notre Dame Church. Counts five and six allege the theories of respondeat superior and apparent authority against the diocese. Counts seven and nine allege negligence against the diocese and Notre Dame Church, respectively, in hiring, training, and supervising Jean. Count eight alleged that the diocese had violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., in assigning priests within the diocese. On March 30, 1999, this court granted the diocese's motion to strike this count. Thus, the motion for summary judgment focuses on counts five, six, seven and nine of the complaint.

In support of their motion, the diocese and Notre Dame Church (or, collectively, the defendants) have

---

[1] Under General Statutes § 58-577d, the plaintiff has a period of seventeen years to file an action for sexual exploitation occurring during his minority. Although the plaintiff alleges sexual acts occurring through 1984, as a legal matter this action encompasses only sexual acts occurring through February 2, 1982, when the plaintiff turned eighteen years of age.

filed eight affidavits from church officials.[2] Together, these affidavits allege the following. The laws and standards of the Roman Catholic Church, as implemented by the Diocese of Norwich, require priests to be celibate. The Roman Catholic Church and the diocese also hold the view that all sexual activity between persons of the same sex is morally wrong. The diocese and Notre Dame Church have taught these principles to their members and communicated them to the general public. The Roman Catholic Church expects its priests to lead others by the example of living their personal lives in a morally upright way. The diocese has maintained a policy of reporting, investigating and dealing with any of its priests alleged to have engaged in any misconduct.

Jean was ordained a Roman Catholic priest in 1957, after his graduation from a theological seminary in France. Prior to the decision to ordain Jean, diocesan officials received written assurances from the seminary and an independent church investigation that Jean had the moral character, fitness and ability to serve as an able priest. Among the many specific moral and religious criteria about which the investigator reported favorably was whether Jean always conducted himself "properly and prudently with boys, girls and women." From 1957 to 1970, Jean served as an assistant pastor in various local parish churches within the Diocese of Norwich. He proved himself to be an excellent priest who performed his ministry well. Diocesan officials did not perceive any moral disorder or any other impropriety in Jean's conduct.

Diocesan officials consulted with each other prior to Jean's appointment as pastor of Notre Dame Church in 1970. They were unaware of Jean having engaged in

___

[2] The defendants attached three of the affidavits to their reply brief rather than their original brief. The plaintiff does not object to this presentation because he contends that it highlights the existence of disputed factual issues in the case.

any sexual misconduct or having any propensity for such misconduct. During Jean's tenure at Notre Dame Church, diocesan officials made occasional visits to the church and received regular reports concerning Jean's job performance. Throughout Jean's tenure at Notre Dame Church, which ended in 1984, neither diocesan officials nor the Notre Dame Church board of trustees received any complaints or information that might have led them to know or suspect that Jean was engaging in or likely to engage in any sexual misconduct or that he posed any risk of danger to minor males. On the contrary, the information that church officials received led them to conclude that Jean was performing his priestly ministry well.

In response to the summary judgment motion, the plaintiff has filed his own affidavit and portions of his own deposition and the deposition of Jean. The affidavit and the plaintiff's deposition excerpts address the nature and location of the alleged sexual activity by Jean. In the attached portions of Jean's deposition transcript, Jean denies that, prior to his ordination, he underwent any psychological or psychiatric testing or that church officials interviewed or asked him about the nature of his sexuality. He also denies that, during his tenure at Notre Dame Church, diocese officials visited his church to see "what was going on" or that they regularly summoned him to the diocese to report goings on at Notre Dame Church.

### III

### DISCUSSION

Summary judgment is appropriate if "the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. The trial court "must view the evidence in the light most favorable to the nonmoving

party." *Connell* v. *Colwell*, 214 Conn. 242, 247, 571 A.2d 116 (1990). "The party moving for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts . . . ." (Internal quotation marks omitted.) *Fogarty* v. *Rashaw*, 193 Conn. 442, 445, 476 A.2d 582 (1984).

On the other hand, the party opposing summary judgment must demonstrate the existence of a material fact issue by "counteraffidavits and concrete evidence." (Internal quotation marks omitted.) *Pion* v. *Southern New England Telephone Co.*, 44 Conn. App. 657, 663, 691 A.2d 1107 (1997). Further, "unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact . . . ." (Internal quotation marks omitted.) *New Milford Savings Bank* v. *Roina*, 38 Conn. App. 240, 245, 659 A.2d 1226, cert. denied, 235 Conn. 915, 665 A.2d 609 (1995). When a party moves for summary judgment and "there [are] no contradictory affidavits, the court property decide[s] the motion by looking only to the sufficiency of the [movant's] affidavits and other proof." *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 795, 653 A.2d 122 (1995).

A

Respondeat Superior

Count five of the complaint alleges that Jean was acting within the scope of his employment as a parish priest when the alleged sexual misconduct took place and, therefore, the diocese is liable under the doctrine of respondeat superior. This doctrine holds an employer liable for torts committed by an employee "within the scope of his employment and in furtherance of the employer's business." *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 208, 579 A.2d 69 (1990). The phrase "[i]n the course of employment [however] means while engaged in the service of the master, and it is not

synonymous with the phrase during the period covered by his employment." (Internal quotation marks omitted.) *Gutierrez* v. *Thorne*, 13 Conn. App. 493, 499, 537 A.2d 527 (1988).

Ordinarily, the question of whether the wilful act of an employee has occurred within the scope of employment is one of fact. *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 216 Conn. 207. There are occasional cases, however, when a servant's digression from duty is so clear that the question becomes one of law. Id. The Appellate Court has held that a sexual assault committed by a state department of mental retardation employee against a client while the employee was at work is not within the scope of his employment as a matter of law. See *Gutierrez* v. *Thorne*, supra, 13 Conn. App. 499. Also, in *Nutt* v. *Norwich Roman Catholic Diocese*, 921 F. Sup. 66, 71 (D. Conn. 1995), a federal district court, applying Connecticut law, held that a priest who sexually abused two altar boys did not, as a matter of law, act within the scope of his employment because "[s]exually abusive conduct amounts to the abandonment of the [church's] business." The Appellate Court, in discussing *Nutt*, has stated that "a trier of fact could *not* reasonably find that a priest's showing pornographic films to young boys and then criminally sexually molesting them in out-of-town motel rooms merely represented a negligent and misguided effort at pastoral counseling." (Emphasis in original.) *Mullen* v. *Horton*, 46 Conn. App. 759, 770, 700 A.2d 1377 (1997).[3] These holdings and statements govern the present case, which is identical in all material aspects to *Nutt*.

[3] *Mullen* itself held that a jury could reasonably have found that consensual sexual relations between a priest/psychologist and an adult who sought counseling from him represented a "negligent and misguided effort at pastoral counseling" and, therefore, was within the scope of the priest's employment. *Mullen* v. *Horton*, supra, 46 Conn. App. 770–71. The present case is readily distinguishable, as the language quoted in the text reveals.

The plaintiff does not strenuously dispute this result. He instead argues that the defendants ratified Jean's conduct, thereby bringing the agent's conduct back within the scope of his employment and making the principal directly liable for the acts of the agent. See *Larsen Chelsey Realty Co.* v. *Larsen,* 232 Conn. 480, 505, 656 A.2d 1009 (1995). The plaintiff argues in his memorandum of law that this ratification occurred when "either having been informed of similar acts by Jean or being presented with incidents that should have alerted it to Jean's misconduct, the Diocese ignored the problem and took no action." Even if this allegation states a claim of ratification by silence; see *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.,* 171 Conn. 63, 72, 368 A.2d 76 (1976); there is no evidence to support it. The undisputed evidence shows that church officials did not receive any reports of sexual misconduct by Jean and were not informed of any unusual conduct by Jean that should have alerted them to Jean's alleged exploitation of a minor male. Accordingly, the defendants cannot be held liable under the theory of vicarious liability.

## B

### Apparent Authority

The sixth count of the complaint claims that the diocese is liable under the doctrine of apparent authority. The plaintiff alleges that the defendants held Jean out to the public as a priest who provided counseling and that, even after receiving at least constructive notice of Jean's sexual misconduct, the defendants allowed Jean to remain as a priest at Notre Dame Church. According to the plaintiff, the defendants' actions or inactions caused him to rely in good faith on the belief that Jean was legitimately performing his duties as a parish priest.

An examination of the cases cited by the parties reveals that, in Connecticut, the doctrine of apparent authority is a principle of contract law or evidence rather than the law of torts. See, e.g., *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 674–76, 686 A.2d 491 (1997) (contracts); *Munson* v. *United Technologies Corp.*, 28 Conn. App. 184, 188–89, 609 A.2d 1066 (1992) (evidence). Indeed, in *Mullen* v. *Horton*, supra, 46 Conn. App. 770, the Appellate Court confirmed that, in Connecticut, the doctrine of apparent authority "has never been used"; id., 772; as it has in other states, where some courts have held that "a principal, who represents that another is his servant or agent and thereby causes a third person to rely justifiably on the care or skill of such agent, [can be] vicariously liable for harm caused to the third person by the lack of care or skill of his servant or agent." Id., 771. The *Mullen* court added that the doctrine of apparent authority was inapplicable to the case before it, which is quite similar to the present case. Id., 772; see footnote 3 of this opinion. Since the plaintiff, in count six of his complaint, relies on the same claim that the doctrine of apparent authority creates a species of vicarious tort liability, it follows that the defendant is entitled to "judgment as a matter of law" on that count. Practice Book § 17-44.

In addition, there is no material factual issue about whether the defendants held out Jean as authorized to engage in the alleged sexual exploitation. The undisputed evidence shows that the defendants hold and teach the belief that priests should be celibate and live morally upright lives and that persons should not engage in homosexual acts. Further, as discussed in greater detail in the next part of this opinion, there is no evidence that the defendants knew or even should have known of the alleged misconduct while it was taking place. Accordingly, there is neither a legal nor

an evidentiary basis upon which to find the diocese vicariously liable in tort on the theory of apparent authority.

## C

## Negligent Hiring and Supervision

Counts seven and nine of the plaintiff's complaint allege that the diocese and Notre Dame Church, respectively, were negligent in hiring, training, supervising and retaining Jean in that they knew or should have known that Jean posed a danger to minor males. The plaintiff also claims that the defendants should have notified their employees and the plaintiff's family concerning this matter and that the diocese should have maintained a policy of reporting, investigating and pursuing clergy engaged in sexual misconduct with minors. The defendants respond primarily with the argument that there is no evidence that they knew or should have known about Jean's misconduct.

Negligence is often defined as "a breach of duty." (Internal quotation marks omitted.) *Shore* v. *Stonington*, 187 Conn. 147, 151, 444 A.2d 1379 (1982). "The existence of a duty is a question of law." Id. "Existing Connecticut precedents impose only a limited duty to take action to prevent injury to a third person." *Fraser* v. *United States*, 236 Conn. 625, 632, 674 A.2d 811 (1996). In order for such a duty to arise, there must be a "special relationship of custody and control . . . ." (Internal quotation marks omitted.) Id. Courts have held that the relationship of employer to employee does fall within this category. See generally *Shore* v. *Stonington*, supra, 155–56.

In any determination of whether a special relationship should give rise to a duty to exercise care to avoid harm to a third person, the key element is foreseeability. *Fraser* v. *United States*, supra, 236 Conn. 632. The

threshold inquiry is "whether the specific harm alleged by the plaintiff was foreseeable to the defendant." (Internal quotation marks omitted.) Id., 633. The specific test entails: "(1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 572, 717 A.2d 215 (1998).

In the present case, there is no evidence at all that the defendants knew of Jean's alleged sexual misconduct while it was taking place. The plaintiff instead focuses on the claim that the defendants should have known about it. The evidence, however, uniformly supports the opposite conclusion. It is undisputed that the defendants received written assurances from both Jean's seminary and from an independent investigation that Jean had the moral character, fitness and ability to serve as a competent priest and to relate to children appropriately. Jean then served ably as an assistant pastor for thirteen years without a hint of trouble. Diocesan officials consulted with each other prior to Jean's appointment as pastor of Notre Dame Church in 1970 and had no information to suggest that he would commit sexual crimes.

It is also undisputed, as the plaintiff points out, that church officials did not require Jean to submit to any psychological or psychiatric testing or to answer questions about his sexuality. It is not clear, however, that such testing or questioning would have produced any relevant information. In any case, there was no reason to use these methods. It is simply not reasonable to

hold that church officials had a duty to conduct an investigation with the depth of a Federal Bureau of Investigation background check or a Pentagon security clearance.[4] This point was especially true in 1970, when claims of sexual abuse by clergy were much less common. Further, nothing in Jean's background check even suggested any mental or sexual disorder that should have prompted church officials to probe further than they did. See *Nutt* v. *Norwich Roman Catholic Diocese*, 56 F. Sup. 2d 195, 201 (D. Conn. 1999).

The plaintiff also contends that the defendants should have known about Jean's alleged propensities while supervising him from 1970 to 1984. The plaintiff relies on Jean's deposition to create a factual dispute concerning whether diocesan officials visited Notre Dame Church and whether they regularly summoned him to the diocese to report on matters at his church.[5]

Even if the deposition does create a genuine issue about these facts, it does not upset the larger conclusion that the defendants could not reasonably have known about Jean's alleged activities.[6] The plaintiff's submission does not negate the defendants' allegations that,

[4] Indeed, even the United States military, which officially prohibits its members from engaging in homosexual activity, implements this stance through a "don't ask, don't tell" policy. See *Able* v. *United States*, 155 F.3d 628, 630–36 (2d Cir. 1998).

[5] The plaintiff also alleges in paragraph 9f of count nine of the complaint that Jean was spending "an inordinate amount of time" with the plaintiff in the rectory. The plaintiff supplies no evidence to support this allegation. As stated, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine fact. *New Milford Savings Bank* v. *Roina*, 38 Conn. App. 240, 245, 659 A.2d 1226, cert. denied, 235 Conn. 915, 665 A.2d 609 (1995).

[6] The defendants presented detailed records showing that diocesan officials visited Notre Dame Church at least ten times between 1972 and 1983. The affidavit of one of these officials, Bishop Daniel P. Reilly, avers that, during his visits, he spoke to staff and parish members and made his own observations, all of which led him to conclude that Jean was performing his priestly ministry well and without any indication of moral flaw. Against this specific and well documented presentation, the plaintiff posits Jean's testimony, which consists of a simple "No" answer to the question: "During

throughout Jean's tenure at Notre Dame Church, diocesan officials maintained a policy of reporting, investigating and dealing with any of its priests alleged to have engaged in any misconduct. Nor do the plaintiff's submissions dispute the defendants' evidence that, consistent with this policy, the defendants received regular reports concerning Jean's performance, that they received no complaints or information that might have led them to know or suspect that Jean posed any risk to minors and that the information they did receive was all positive. The plaintiff has failed to dispute this evidence by "counteraffidavits and concrete evidence." (Internal quotation marks omitted.) *Pion* v. *Southern New England Telephone Co.*, supra, 44 Conn. App. 663.

Given this undisputed evidence, there is no genuine issue of material fact concerning whether the defendants should have anticipated "that harm of the general nature of that suffered was likely to result . . . ." *Noebel* v. *Housing Authority*, 146 Conn. 197, 201, 148 A.2d 766 (1959). The defendants simply received no clues about Jean's alleged clandestine activities. The law does not require them to be clairvoyant. See *Martinelli* v. *Bridgeport Roman Catholic Diocesan Corp.*, 989 F. Sup. 110, 118–20 (D. Conn. 1997) (summary judgment granted diocese in priest sexual abuse case despite letter from seminary that priest was in " 'need of guidance in the first years of his priestly work' "); *Kennedy* v. *Roman Catholic Diocese of Burlington*, 921 F. Sup. 231, 233–34 (D. Vt. 1996) (summary judgment granted to diocesan officials in priest sexual abuse case even though they had received complaints that priest

your tenure at Notre Dame Church in Durham, were there ever Diocesan officials who would visit the church in Durham to see what was going on?" It is certainly questionable whether Jean's monosyllabic response to this question creates a "genuine issue" of fact. Practice Book § 17-49. It is not necessary to resolve this issue, however, because, as discussed previously, the other, undisputed evidence establishes that the defendants are entitled to summary judgment.

had spent too much time with plaintiff's family and plaintiff in particular). Accordingly, the defendants had no duty to prevent harm to the plaintiff.[7]

## IV

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted.

---

[7] The conclusion that the defendants had no duty to the plaintiff disposes of the subsidiary claims that the defendants were negligent in hiring and supervising Jean, that they failed to provide proper notice to affected parties concerning this matter, or that the defendants failed to maintain an adequate policy concerning sexual misconduct of priests. It is also unnecessary to resolve whether the free exercise of religion clause of the first amendment bars inquiry into the adequacy of the church's employee hiring and supervision policies. But see *Nutt* v. *Norwich Roman Catholic Diocese,* supra, 921 F. Sup. 72–74.